## UNITED STATES v. UNITED MINE WORKERS OF AMERICA et al.

### Civil Action No. 37764.

District Court of the United States for the District of Columbia.

Dec. 5, 1946.

John F. Sonnett, Asst. Atty. Gen., John Ford Baecher, Joseph M. Friedman, J. Francis Hayden, and Robert L. Werner, Sp. Assts. to the Atty. Gen., and George Morris Fay, U. S. Atty., of Washington, D. C., for the Government.

Welly K. Hopkins, of Washington, D. C., Edmund Burke, of Springfield, Ill., T. C. Townsend, of Charleston, W. Va., and Harrison Combs, Joseph A. Padway, Henry Kaiser, and James A. Glenn, all of Washington, D. C., for defendants.

GOLDSBOROUGH, District Judge.

The Court delivered the following opinion orally in overruling the motion of the defendants to discharge and vacate the Rule to Show Cause why the defendants should not be held in contempt:

The Court. Gentlemen, the Court is ready to rule.

It happens that the Court was a Member of Congress at the time the Norris-La-Guardia Act, 29 U.S.C.A. § 101 et seq., became law and during the debates in the consideration of it. Mr. LaGuardia and I were legislatively always very close. I think I am correct in saying that I supported every measure that he was interested in— I mean primarily interested in—and that he supported every measure that I was primarily interested in. He directed his activities principally toward the labor movement, in what he considered the public interest; and mine were directed toward the currency.

As I said before, I am sure he always supported me; and, as far as I remember, I always supported him. So I am sure I am thoroughly familiar with the Norris-LaGuardia Act and its purposes and the reasons for it.

It is notorious that around, I guess, from 1890 on, the Federal courts were used by powerful interests for the purpose of defeating attempts on the part of labor to improve their welfare, increase their wages, improve their living conditions, and to help themselves in various ways.

Now, it takes a long time to arouse the public, sometimes, but the Clayton Act, 15 U.S.C.A. § 12 et seq., was the first affirmative expression of their resentment of the action of the courts, and the Norris-La-Guardia Act was the culminating expression of their feeling that the courts were entirely in the wrong in the way they issued injunctions in labor disputes.

The Court remembers very distinctly the amendments that were offered by Mr. Beck, I think, of Pennsylvania—and I forget who offered the others—which endeavored expressly to exclude the United States in practically all cases, under all circumstances, from the operation of the Norris-LaGuardia Act. But those in favor of the Act felt that in inclusion—an express in-

clusion—might defeat the purposes of the Act in a great many cases, and that the Government was amply protected by the general principle where the Government was not specifically mentioned or included by necessary implication in a given case— that the language of the Act did not apply to the Government.

The leading case on that subject in this country—and it is still in force and effect —is the case of the Dollar Savings Bank v. United States, found in 19 Wall. 227, 22 L.Ed. 80. In that case the Federal Government brought an action of debt in Pennsylvania to collect a tax. The statutes provided that an ordinary common-law action of debt was not applicable in cases for the collection of taxes. There is a special statute that would ordinarily cover a case of that kind, a special statute for the collection of taxes.

The Federal Government brought an ordinary action for the collection of debt at common law, which the Savings Bank contended was not legal. Here is what the Court said. The Court did not take that view. The Court held that an ordinary action of debt if brought by the United States would lie. This is what the Court said:

"It is a familiar principle that the King is not bound by any Act of Parliament unless he be named therein by special and particular words. The most general words that can be devised (for example, any person or persons, bodies politic or corporate) affect not him in the least, if they may tend to restrain or diminish any of his rights and interests."

Certain cases are cited.

"He may even take the benefit of any particular Act, though not named. The rule thus settled respecting the British Crown is equally applicable to this Government, and it has been applied frequently in the different States and practically in the Federal courts. It may be considered as settled that so much of the royal prerogative as belonged to the King in his capacity of parens patriae, or universal trustee, enters as much into our political state as it does into the principles of the British Constitution."

As I said before, that is the leading case.

But the Court feels that the doctrine is stated with more and greater clearness than anywhere else that the Court has found it in Black on Interpretation of Laws, Second Edition. I am reading from pages 94 and 95:

"General words in a statute do not include nor bind the Government by whose authority the statute was enacted, where its sovereignty, rights, prerogatives, or interests are involved. It is bound only by being expressly named or by necessary implication from the terms and purposes of the Act.

"This is a very ancient rule of the English law and is equally applicable to the national and state governments in this country. It is said that laws are supposed to be made for the subjects or citizens of the State, not for the sovereign power. Hence, if the Government is not expressly referred to in a given statute, it is presumed that it was not intended to be affected thereby, and this presumption, in any case where the rights or interests of the State would be involved, can be overcome only by clear and irresistible implications from the statute itself. Generally speaking, therefore, the State is not bound by the provisions of any statute, however generally it may be expressed, by which its sovereignty would be derogated from, or any of its prerogatives, rights, titles, or interests would be divested, save where the Act is specifically made to extend to the State or where the legislative intention in that regard is too plain to be mistaken."

In this case, what society, what the sovereign power, was endeavoring to do was to hold a matter involving the public interest, a matter involving a potential public calamity, by an entity which had been given power by the sovereignty itself, the labor union, from taking the contemplated action, which, as I said before, would amount to a public calamity, until there could be a judicial determination of whether it had the right to take such action.

The Court thinks that undoubtedly under the general rules which the Court has spoken of, the Norris-LaGuardia Act did not and does not apply; and following that opinion on the part of the Court, the Court had the same rights that the Court would

have had prior to the passage of the Norris-LaGuardia Act and the Clayton Act.

So it is perfectly clear that prior to the Norris-LaGuardia Act and the Clayton Act, a court of equity had the right to enjoin a labor union which, in the opinion of the Court, was about to do something which was against the public interest, including the ultimate interest of the union itself.

The Court thinks that that opinion substantially disposes of this motion to discharge and vacate the rule to show cause, because under Section 385 of the United States Code Annotated, Vol. 28, the statement is made:

"The * * * courts shall have power to impose and administer all necessary oaths, and to punish, by fine or imprisonment, at the discretion of the court, contempts of their authority. Such power to punish contempts shall not be construed to extend to any cases except the misbehavior of any person in their presence, or so near thereto as to obstruct the administration of justice, the misbehavior of any of the officers of said courts in their official transactions, and the disobedience or resistance by any such officer, or by any party, juror, witness, or other person to any lawful writ, process, order, rule, decree, or command of the said courts."

The Court thinks the defendants were notified by the rule to show cause, in detail, as to what they were charged with having done; and if what they were charged with having done amounted to a criminal contempt, they had notice of the fact that it was a criminal contempt.

Of course, I myself noticed some time ago, several days ago, that part of the rule which requires criminal contempt to be alleged, to be alleged as such; but in view of the fact that the specific charges were stated in the rule to show cause, and those charges were of a character of which the defendant had notice, if they were criminal, the defendant had notice of the fact that they were criminal; and if it is a mistake not to have charged that the contempt was criminal specifically, it is not sufficient at all to vitiate the proceeding.

In this particular case, under the circumstances it is an omission that could do no one any harm. The Court does not think that the contention that freedom of speech has been violated is a matter for serious consideration. The Court repeats again what the Court said several times on Wednesday: that this proceeding was for the sole purpose of holding the status quo until there could be a judicial determination of the contract between the United States and the United Mineworkers of America. The Court thinks that that must have been thoroughly understood by the union. It was thoroughly understood, certainly, by every other thinking person in the United States who was interested in the matter.

Furthermore, I think the Court should say that it was perfectly evident from the Court's order that what the Court was commanding was that this statement that the contract between the Union and the Government had expired should be rescinded, and that other matter in the order was simply ancillary to that, in order to prevent that particular requirement of the order being evaded.

The motion, gentlemen, to discharge and vacate the rule to show case is overruled.

In holding the defendants guilty of contempt the Court made the following Findings of Fact and Conclusions of Law:

### Findings of Fact.

Upon consideration of the entire record, the briefs, and arguments of counsel, the Court finds that it has been established beyond a reasonable doubt that:

1. On May 21, 1946, after investigation, the President of the United States found and proclaimed that there were interruptions or threatened interruptions in the operation of the mines producing bituminous coal as the result of existing and threatened strikes or other labor disturbances; that the coal produced by such mines was required for the war effort and was indispensable for the operation of the national economy during the transition of war to peace; that the war effort would be unduly impeded or delayed by such interruptions; and that the exercise, by the President, of the powers vested in him by the Constitution and Laws of the United States was necessary to insure the operation of such mines in the interest of the war effort and

to preserve the national economic structure in the then existing emergency.

2. On May 21, 1946, the President of the United States, by virtue of the authority vested in him by the Constitution and Laws of the United States, issued Executive Order 9728, whereby he authorized and directed the Secretary of the Interior to take possession of any and all bituminous coal mines the operations of which were then interrupted or threatened with interruption because of work stoppages and to the extent that he might deem necessary, of any real or personal property, franchises, rights, facilities, funds, and other assets used in connection with the operation of such mines; to operate or arrange for the operation of such mines in such manner as he might deem necessary in the interest of the war effort; and to do all things necessary for, or incidental to, the production, sale, and distribution of the coal produced, prepared, or handled by the said mines.

3. Pursuant to the provisions of said Executive Order 9728, the United States, through J. A. Krug, the Secretary of the Interior, on and after May 22, 1946, duly took possession of most of the bituminous coal mines of the nation. Since that time, the United States, through the Secretary of the Interior, has been and now remains in possession of such coal mines.

4. As a consequence of negotiations authorized by the said Executive Order 9728, the Secretary of the Interior, as Coal Mines Administrator, on May 29, 1946, executed an agreement at Washington, D. C., with the defendant John L. Lewis, as President of the defendant Union (which agreement is hereinafter sometimes referred to as the Krug-Lewis Agreement.)

5. On May 29, 1946, the Secretary of the Interior, acting pursuant to the authority of the aforesaid Executive Order 9728 and Section 5 of the War Labor Disputes Act, 50 U.S.C.A.Appendix, § 1505, and in accordance with the provisions of the Krug-Lewis agreement, filed an application with the National Wage Stabilization Board for changes in wages and other terms and conditions of employment at the bituminous coal mines in Government possession. The National Wage Stabilization Board thereupon, on May 31, 1946, issued its order, pursuant to Section 5 of the War Labor Disputes Act, approving changes in wages and other terms and conditions of employment agreed upon in the Krug-Lewis agreement and directed that they be put into effect at the said mines. Said order was approved by the President of the United States on May 31, 1946.

6. The Krug-Lewis agreement, by its terms, "covers for the period of Government possession the terms and conditions of employment in respect to all mines in Government possession which were as of March 31, 1946, subject to the National Bituminous Coal Wage Agreement, dated April 11, 1945."

7. The defendant Lewis, on October 21, 1946, sent a letter to the Secretary of the Interior in which he stated that Section 15 of the National Bituminous Coal Wage Agreement, dated April 11, 1945, had been specifically carried forward into the Krug-Lewis agreement and that under that section, either party to the Krug-Lewis agreement might give ten days' notice in writing of a desire for a negotiating conference upon the matters outlined in said notice; that the other party to the Krug-Lewis agreement was thereupon required to attend said negotiating conference; and that at the end of fifteen days after the beginning of said negotiating conference, either party might give to the other, a notice in writing of the termination of the Krug-Lewis agreement, to be effective five days after the receipt of such notice. Acting pursuant to this interpretation of the Krug-Lewis agreement, the defendant Lewis notified the Secretary of the Interior that the defendant Union requested "a joint conference of the accredited representatives of the joint contracting parties to the Krug-Lewis agreement of May 29, 1946, for the purpose of negotiating new arrangements affecting wages, hours, rules, practices, differentials, inequalities and all other pertinent matters affecting or appertaining to the National Bituminous coal industry.

8. In reply thereto, on October 22, 1946, N. H. Collisson, Captain, USNR, as Coal Mines Administrator, acting for the Secre-

tary of the Interior, sent a letter to the defendant Lewis in which the Coal Mines Administrator stated that the Krug-Lewis agreement had superseded Section 15 of the National Bituminous Coal) Wage Agreement dated April 11, 1945; that the provisions of said Section 15 were no longer in effect; that, therefore, the Secretary of the Interior and the Coal Mines Administrator were unable to treat the defendant Lewis' letter of October 21, 1946, as a notice given pursuant to any existing contract provisions; and that the Coal Mines Administration considered the Krug-Lewis agreement in full force and effect; but that the Administration was ready to meet with the defendant Lewis "to discuss matters affecting the operation of the bituminous coal mines under the Krug-Lewis agreement, and for that purpose, with the above reservations, any date for such discussions is agreeable to this Administration."

9. On the same day, the defendant Lewis sent a further letter to the Secretary of the Interior in which he reiterated his position and asserted that failure of the Secretary of the Interior to accede to his request would void the Krug-Lewis agreement.

10. On October 27, 1946, the Secretary of the Interior sent a telegram to the defendant Lewis requesting the defendant Lewis and (or) his representatives to meet with the Coal Mines Administrator and his associates on November 1 or any other date agreeable to the defendant Lewis.

12. In reply to the said telegram of October 27, 1946, the defendant Lewis, by a telegram of October 28, 1946, to the Secretary of the Interior, advised the Secretary of the Interior as follows:

"I esteem your telegram 27th, received by me today, as compliance with request for official conference contained by letter 21 October. I accordingly advise that representatives United Mine Workers will meet with Coal Mines Administrator Collisson and his associates at 11 o'clock a. m. on Friday, 1 November. Under these conditions Krug-Lewis Agreement remains effective and unchanged during period of negotiation."

13. On November 1, 1946, a conference was held in Washington, D. C., attended by representatives of the Secretary of the Interior and of the defendant Union, and that conference was thereafter continued from time to time, from November 1 to and including November 14, 1946, all without prejudice to the contentions of the respective parties regarding the right claimed by the defendants to terminate the Krug-Lewis agreement by unilateral notice. During the course of the meeting, on November 11, 1946, attended by the defendant Lewis and the Secretary of the Interior, among others, the representatives of the defendant Union for the first time advanced specific proposals for changes in the wages and other terms and conditions of employment in effect at the bituminous coal mines in the Government's possession which proposals included changes of a substantial and far-reaching nature and which would involve an increase in the cost of production of coal at the mines of at least fifty cents a ton.

14. Thereafter, on November 15, 1946, the defendant Lewis sent a letter to the Secretary of the Interior stating that "Fifteen days having now elapsed since the beginning of the above conference, the United Mine Workers of America, exercising its option, hereby terminate said Krug-Lewis agreement as of 12:00 o'clock P. M., midnight, Wednesday, November 20, 1946."

15. On the same day the Secretary of the Interior advised the defendant Lewis, by letter, "that you have no power under the Krug-Lewis agreement of May 29 or under the law, by unilateral declaration, to terminate the contract which by its terms 'covers for the period of Government possession the terms and conditions of employment.' "

16. It has been for some years, and is now, as the defendants at all times, well knew, the well-established policy of the defendant Union, consistently adhered to by its members, that the miners will not work in the absence of a contract, and that upon the declaration by the defendants that no contract exists, the miners cease work. No other stoppage order ever goes out. Such a declaration of "no contract" is in fact a call to strike.

17. The defendants sent out and distributed to the membership of the defendant Union a notice dated November 15, 1946, which read as follows:

United Mine Workers of America

John L. Lewis, President

Metropolitan 0530

[SEAL]

United Mine Workers' Building

Washington 5, D. C.

November 15, 1946.

To the Members of the United Mine Workers of America:

Greetings:

The following is the exact text of a letter sent to the Secretary of the Interior, in charge of Coal Mines Administration:

"November 15, 1946.

"Honorable J. A. Krug,

"Secretary of the Interior, Washington, D. C.

"Dear Mr. Secretary:

"In accordance with the provisions of the Krug-Lewis Agreement dated May 29, 1946, the United Mine Workers of America on October 21, 1946, officially requested a joint conference of the accredited representatives of the joint contracting parties to said agreement. Such conference convened on November 1, 1946.

"Fifteen days having now elapsed since the beginning of said conference the United Mine Workers of America, exercising its option, hereby terminates said Krug-Lewis Agreement as of 12:00 o'clock P.M., midnight, Wednesday, November 20, 1946.

"Yours truly,

"United Mine Workers of America,

"By: John L. Lewis, President."

The foregoing is for your official information.

Sincerely yours,

/s/ John L. Lewis,

President.

This notice was a cease work or strike notice.

18. The letters of November 15, 1946, from the defendants to the Secretary of the Interior, purporting to terminate the Krug-Lewis agreement as of November 20, 1946, was released by the defendants to, and published by, the public press on or about November 15 and 16, 1946.

19. Thereafter, on November 18, 1946, the United States Attorney General of the United States, brought a suit against the United Mine Workers of America, an unincorporated association, and John L. Lewis, individually and as president of the United Mine Workers of America, under the Federal Declaratory Judgment Act, 28 U.S.C. A. § 400, to obtain a declaration of rights and other legal relations, including a declaratory judgment or decree, an order for temporary injunctive relief, and such further relief as might be necessary or proper.

20. Upon the filing of the verified complaint, and upon plaintiff's application, this Court, on November 18, 1946, issued a temporary restraining order against the defendants, based upon the facts alleged in the complaint and upon affidavits filed in support of the application for the restraining order. The restraining order directed:

" * * * that the defendants and each of them and their agents, servants, employees and attorneys, and all persons in active concert or participation with them, be and they are hereby restrained pending further order of this Court from permitting to continue in effect the notice heretofore given by the defendant John L. Lewis to the Secretary of Interior dated November 15, 1946; and from issuing or otherwise giving publicity to any notice that or to the effect that the Krug-Lewis Agreement has been, is, or will at some future date be terminated, or that said agreement is or shall at some future date be nugatory or void at any time during Government possession of the bituminous coal mines; and from breaching any of their obligations under said Krug-Lewis Agreement; and from coercing, instigating, inducing or encouraging the mine workers at the bituminous coal mines in the Government's possession, or any of them, or any person, to interfere by strike, slow-down, walk-out, cessation of work, or otherwise, with the operation of said mines by continuing in effect the aforesaid notice or by issuing any notice of termination of agreement or through any other means or

device; and from interfering with or obstructing the exercise by the Secretary of the Interior of his functions under Executive Order 9728; and from taking any action which would interfere with this Court's jurisdiction or which would impair, obstruct, or render fruitless, the determination of this case by the Court."

The restraining order by its terms provided that it would expire at 3:00 o'clock p. m. on November 27, 1946, unless extended. Plaintiff's motion for a preliminary injunction was set down for hearing on November 27, 1946, at 10:00 o'clock a. m.

21. The defendants, and each of them, were duly and properly served at 2:15 p. m. on November 18, 1946, with a certified copy of the temporary restraining order, together with copies of the verified complaint, including and embracing plaintiff's prayer and motion for a temporary restraining order, and the supporting affidavits.

22. Following the service upon them of the Court's temporary restraining order, the defendants, as hereinafter more fully appears, have taken no action designed to withdraw the notice of alleged termination dated November 15, 1946, but, on the contrary, have wilfully, wrongfully, and deliberately permitted said notice to continue in effect. The defendants, and each of them, knew, that, in accordance with their own established policy, if the notice of alleged termination were not withdrawn and were permitted to continue in effect, a work stoppage at the mines would occur at midnight November 20, 1946. As a result of the foregoing, on or about November 18, 1946, there commenced at said coal mines a gradual walk-out, strike, cessation of, and refusal to work by the members of defendant Union, which increased daily until 12 o'clock midnight of November 20, 1946. Since that hour and at all times thereafter there has been a walk-out, strike, cessation of, and refusal to work by substantially all of the members of the defendant Union employed at coal mines in the possession of the Government.

23. On November 21, 1946, the United States, by its Attorney General, filed a petition, supported by affidavits, for a rule to show cause why the defendants should not be punished as and for a contempt of this Court, alleging that the defendants, in defiance of the terms of said temporary restraining order, had wilfully, wrongfully, and deliberately disobeyed said order.

24. On said petition and affidavit, the Court on the same day issued a rule to show cause ordering said defendants to appear before this court on November 25, 1946, to show cause why they should not be punished as and for contempt of this court. It was further ordered that if upon the return of said defendants it should be found that the alleged contempt was not sufficiently purged, a trial should be held on November 27, 1946, and the defendants should, unless waived by them, be tried upon the charges of contempt by this court with an advisory jury to be empaneled by the court.

25. On the return day, the defendants, being represented by counsel, and with the defendant John L. Lewis personally present in court, made an oral return to the rule to show cause as follows:

"The defendants and each of them respectfully state to the Court that they and each of them, since the giving of said notice of November 15, 1946, since the issuance of Your Honor's temporary restraining order of November 18, have done no act nor spoken any word pertaining to said notice or in reference to permitting it to continue in effect.

"The status of the notice and the position of each of the defendants in reference thereto remains today in the status which existed at the time of its giving and at all times subsequent thereto.

"The defendants and each of them, Your Honor, therefore respectfully say to this Court that the situation with respect to such notice of November 15, 1946, for the reasons herein stated remains unchanged.

"The defendants and each of them respectfully deny the jurisdiction of this Honorable Court to have issued the tempo-

rary restraining order and the rule to show cause issued thereunder.

"The defendants will be prepared to present arguments on this question on November 27, the time fixed by the Court in its order, as we understand it, for the hearing of this case."

26. Thereupon, the court, finding that a contempt had been alleged and that the alleged contempt had not been sufficiently purged by the defendants' return, ordered that the matter be set down for trial on November 27, 1946.

27. On November 26, 1946, defendants filed and served upon plaintiff a motion to discharge and vacate the rule to show cause in which they asserted that the court was without jurisdiction over the subject matter of the cause; that equity will not enjoin the commission of a crime; that this was a proceeding for a criminal contempt, the defendants suggesting that it was based wholly on hearsay, information, and belief and should have been presented as an independent proceeding; and, finally, that the restraining order was void because it contravened the First, Fifth, and Thirteenth Amendments to the Constitution of the United States.

28. On November 27, 1946, and again on November 29, 1946, with the defendant Lewis personally in court on both days and both the defendant Union and the defendant Lewis represented by counsel, arguments were presented in support of and in opposition to the motion to discharge and vacate the rule to show cause.

29. On November 27, 1946, before the expiration date of the temporary restraining order issued on November 18, 1946, the court, on plaintiff's application and for good cause shown, over objection of defendants extended said temporary restraining order for a like period of ten days.

30. On November 29, 1946, this court denied defendants' motion to discharge and vacate the rule to show cause and set forth its reasons therefor in an opinion which appears in the record. Thereupon the defendants entered pleas of not guilty, waived their rights, if any, to an advisory jury, and the case proceeded to trial before the court.

31. The defendants were, before the trial, apprised of the fact that they were charged with both a civil and a criminal contempt; were subsequently advised in advance of the names and identities of witnesses to be called by the plaintiff; and were, by their own admission in open court, liberally informed as to all relevant information and were given every opportunity to meet the contentions of the plaintiff.

32. A full and complete hearing extending over a period of four days was had, at which the parties were given full opportunity to present evidence, to cross-examine witnesses, to present argument, and to avail themselves of any and all rights to which they might be entitled.

33. Throughout all hearings on this matter, commencing with the hearing on November 25, 1946, defendant John L. Lewis was personally present before this court.

34. The defendants, and each of them

(a) have at all times since 2:15 p. m. on November 18, 1946, permitted to continue in effect the notice of alleged termination given by the defendant John L. Lewis to the Secretary of Interior on November 15, 1946;

(b) have instigated, induced and encouraged the workers at said mines to interfere, by strike, slow-down, walk-out and cessation of work, with the operation of said mines by continuing in effect the notice of November 15, 1946, purporting to terminate the Krug-Lewis Agreement;

(c) have completed the calling of a strike and have completed the instigation, inducement, and encouragement of the mine workers at the bituminous coal mines in the Government's possession to interfere, by strike, slow-down, walk-out and cessation of work, with the operation of said mines, by permitting to remain outstanding the aforesaid notice of November 15, 1946, purporting to terminate the so-called Krug-Lewis Agreement;

(d) have instigated, induced and encouraged the workers at said mines to interfere by strike, slow-down, walk-out, and cessation of work, with the operation of said mines, thereby interfering with and ob-

structing the exercise by the Secretary of the Interior of his functions under Executive Order No. 9728 and under the War Labor Disputes Act, and with the performance of other governmental functions, by failing to withdraw the notice of November 15, 1946, purporting to terminate the Krug-Lewis Agreement, and by failing to announce to and notify the members of defendant union employed at said mines that said notice of November 15, 1946, was withdrawn, and by failing to notify said members of defendant Union that there is in force and in effect an agreement or contract between the defendant Union and the United States of America; that is, the so-called Krug-Lewis Agreement; and

(e) have interfered with this court's jurisdiction and have impaired and obstructed the determination of this case by the court.

35. As of November 20, 1946, there were approximately 76,000,000 tons of bituminous coal on hand and if the current work stoppage continues production would then be at the rate of about 658,000 tons a week, or about 5.3 percent of the normal production of about 12,500,000 tons a week. Normal requirements of bituminous coal during a three months' period beginning December 2, 1946, would be at the rate of approximately 54,000,000 tons a month, and if all available coal could be treated as a pool, although such ideal distribution cannot as a practical matter be obtained, to be used for an assumed normal consumption the supply on hand on November 20, 1946, would last about 37 days.

36. The characteristics of the economy of the United States make it peculiarly vulnerable to a stoppage in coal production, largely because of its great dependence on machines, about 43 percent of all energy produced in the United States being derived from bituminous coal. Four-fifths of all energy used in driving locomotives on Class 1 railroads is derived from bituminous coal; about four-fifths of all fuels and energy-producing material used in the production of steel is derived from bituminous coal; over 50 percent of all energy used in the production of electric power by public utilities is derived from bituminous coal; and about four-fifths of all energy obtained for electric power is derived from bituminous coal. Over 80 percent of Class 1 railroads, over 60 percent of public utilities and steel-producing industries would have to shut down completely within sixty days if the current coal stoppage continues for that length of time.

37. If the current work stoppage were to continue for a sixty-day period there would be a decline in total employment of at least 5,000,000 full-time workers and the national income would decline from the present rate of $170,000,000,000 per year to a rate of $150,000,000,000 per year with a resulting loss in income paid to workers at the rate of considerably more than $1,000,000,000 per month, and with a loss of national income, a fraction of which has been estimated at one billion to one and one-quarter billion dollars during that period. A loss of even one billion dollars in income payments, only a fraction of the loss which would actually be suffered from a continued work stoppage, would result in a loss to the United States of tax revenues of about $280,000,000.

38. The current work stoppage has caused and will continue to cause irreparable injury to the plaintiff, to the people of the United States and to the industry and economy of the United States.

39. The coal produced by the mines now affected by the work stoppage is indispensable for the continued operation of the national economy during the transition from war to peace.

### Conclusions of Law.

1. The United States in seizing the mines pursuant to Executive Order 9728 and in operating them following such seizure was at all times exercising its sovereign functions derived from the Constitution and Laws of the United States.

2. The defendants, and each of them, have obstructed and interfered with the exercise by the United States of its sovereign functions.

3. The defendants, and each of them, have unlawfully coerced, instigated, induced, and encouraged the mine workers at the bituminous coal mines in the Government's possession to interfere by strike,

slow-down, walk-out, cessation of work, or otherwise, with the operation of coal mines.

4. By reason of the facts found in paragraphs numbered 34(a) through 34(e), above, the defendants, and each of them, have at all times since the service upon them on November 18, 1946, of the temporary restraining order of this Court, wilfully, wrongfully and deliberately disobeyed and violated the terms of the said temporary restraining order, and have obstructed and interfered with the determination of this case by the Court.

5. The defendant United Mine Workers of America at all times since the service upon it on November 18, 1946, of the temporary restraining order, has, beyond a reasonable doubt, committed and continues to commit a civil contempt of this Court.

6. The defendant United Mine Workers of America at all times since the service upon it on November 18, 1946, of the temporary restraining order, has, beyond a reasonable doubt, been guilty, and is now guilty of a criminal contempt of this Court.

7. The defendant John L. Lewis at all times since the service upon him on November 18, 1946, of the temporary restraining order, has, beyond a reasonable doubt, committed and continues to commit a civil contempt of this Court.

8. The defendant John L. Lewis at all times since the service upon him on November 18, 1945, of the temporary restraining order, has, beyond a reasonable doubt, been guilty and is now guilty of a criminal contempt of this Court.

In sentencing the defendants the Court made the following oral statement:

The Court. You see, this is an unusual situation. It is not only an unusual situation but an unprecedented situation.

This is not the act of a low lawbreaker, but it is an evil, demoniac, monstrous thing that means hunger and cold and unemployment and destitution and disorganization of the social fabric; a threat to democratic government itself, and it is proper for me to say at this point that if actions of this kind can be successfully persisted in, the Government will be overthrown, and the Government that would take its place would be a dictatorship, and that the first thing the dictatorship would do would be to destroy the labor unions. That is in accordance with all history.

Now, not only is it the things that I have said, but it is this:

The Government of the United States is endeavoring, through an accepted world leadership, to unite the peoples of the world in such a way as to raise the universal standards of living; to unite the peoples in good fellowship and to increase economic power for the benefit of all people by the work that it is trying to do.

A spectacle of this kind, of course, tends to turn the Government of this country, the social fabric of a democratic people into ridicule in the minds of the people of the world.

It seems to me that this is one of the most serious situations that has ever developed in the republic.

Now, I don't think, as I think I have said before, that anyone wants to see the unions hit a mortal blow, or any blow which will turn back the condition of labor. I think that every thinking and well-informed person understands, as I have said before, that the power of capitalism to produce is practically unlimited; and, aside from humanitarian considerations, aside from the fact that we are all interested in raising the standards of living of all of our people, what capitalism needs is a market, and you cannot have a market unless the people have buying power, and they cannot have buying power unless they have salaries and wages.

I cannot say whether labor has a greater friend in this country than I am or not, but I cannot conceive of it, because I have been that friend ever since the first moment of my conscious thought and opportunity to see things as they were.

Now, the Court does not see this recommendation of the Government, insofar as the union is concerned, as a desire to strike at the miners. Certainly, from the Court's standpoint, it is a desire to protect the miners' ultimate interests. Anything the Court does includes that desire.

As far as the miners themselves are concerned, it is a case of "Father, forgive them, for they know not what they do."

But unless those who are directing the affairs of this union are corrected, they will destroy the union, because if the worst should come to the worst (and it won't), and it is a question of the destruction of this union or the preservation of this Republic, the Republic is going to be preserved.

Now, there is no other method of punishing an unincorporated organization except by a fine. It cannot be done by imprisonment. The Court does not think that the suggestion of the Government constitutes cruel or unusual punishment.

Certainly the action in initiating this totally unnecessary strike is costing the people, including the miners, much more than any fine that will be imposed.

Now, as to the individual defendant:

Of course, no humane court wants to impose punishment on anyone. On the other hand, any court that understands justice wants to impose punishments equally upon peoples of all classes.

As far as the individual is concerned, if he were to be punished in accordance with his offense, the Court thinks that nothing would suffice except a prison sentence, and sometimes the Court doubts if matters of expediency ought ever to govern. Sometimes the Court thinks that the spiritual values in doing exactly the right thing will, as a practical proposition in the end, result—give better results than a decision which may for the time being seem to be wise.

But I may be wrong, and this is a tremendously difficult situation and one in which the Court does not feel that it ought to disregard the advice of the Government.

The Government in this case is not merely a technical party to the suit as it would be, for instance, in a case of larceny or robbery, or a case of the United States against an individual, but in this case the United States represents all the people at a time of great national crisis, and the Court does not think it should disregard its recommendation.

The sentence of the Court insofar as to the United Mine Workers of America, an unincorporated association, will be, in accordance with the Government's recommendation, a fine of $3,500,000.

The sentence as to the individual, John L. Lewis, will be a fine of $10,000.