493 F.2d 112
 73-2 USTC P 74,833, 1973-2 Trade Cases 74,833
 INTERNATIONAL BUSINESS MACHINES CORPORATION, Appellant,
v.
UNITED STATES of America, Appellee.
INTERNATIONAL BUSINESS MACHINES CORPORATION, and Cravath,
Swaine & Moore, Appellants,
v.
UNITED STATES of America, Appellee.
INTERNATIONAL BUSINESS MACHINES CORPORATION, Appellant,
v.
David N. EDELSTEIN, Chief Judge, United States District
Court for the SouthernDistrict of New York, and
United States of America, Appellees.
 Nos. 1133 to 1136, Dockets 73-2126-7, 73-2145-6.
 United States Court of Appeals, Second Circuit.
 Argued Aug. 8, 1973.
Decided Dec. 17, 1973, Certiorari Denied May 13, 1974, See
94 S.Ct. 2409.
 
 Frederick A. O. Schwarz, Jr., New York Ciry (Nicholas deB. Katzenbach, Armonk, N.Y., David Boies, Robert F. Mullen, Ronald S. Rolfe and George A. Vradenburg, III, New York City, of counsel), for appellant International Business Machines Corp.
 Simon H. Rifkind, New York Ciry (Edward N. Costikyan and Mark A. Belnick, New York City, of counsel), for appellant Cravath, Swaine & Moore.
 Howard E. Shapiro, Atty., Dept. of Justice, Washington, D.C. (Thomas E. Kauper, Asst. Atty. Gen., and James I. Serota, Washington, D.C., on the brief), for appellees.
 Before MULLIGAN, OAKES and TIMBERS, Circuit Judges.
 OAKES, Circuit Judge:
 
 
 1
 These appeals are by International Business Machines Corporation (IBM) and Cravath, Swaine & Moore (Cravath), a law firm which has represented IBM throughout the proceedings involved in this Government civil antitrust suit. In No. 73-2126 IBM seeks review of an adjudication of civil contempt against it for failure to comply with the very pretrial discovery order which IBM unsuccessfully sought to appeal or have vacated through a petition for an extraordinary writ in International Business Machines Corp. v. Inited States, 480 F.2d 293 (2d Cir. 1973) (en banc), petition for cert. filed, 42 U.S.L.W. 3033 (U.S. June 11, 1973) (No. 72-1662). In that case the appeal and petition for mandamus were dismissed on the basis of a lack of jurisdiction under the Expediting Act (15 U.S.C. 29) and it was held that in no event was there any basis to review the trial court's interlocutory order either by appeal or mandamus. 480 F.2d at 299. On petition of the Government filed June 25, 1973, Chief Judge Edelstein, after a hearing, entered an opinion, findings and order imposing a contingent, coercive fine of $150,000 per day until IBM complies with his discovery order, Pretrial Order No. 5. This order directed IBM to produce for the Government certain documents which IBM had previously delivered to a third party, Control Data Corporation, in the course of discovery in a civil antitrust action in the United States District Court for the District of Minnesota. IBM's claim both in the prior appeal and in this one is that the documents were protected from discovery by the attorney-client and work-product privileges. The trial judge, however, had ruled that, for purposes of the Government's antitrust suit, IBM had waived its claims of privilege by delivering the documents to Control Data in the Minnesota suit.
 
 
 2
 In No. 73-2127, IBM and Cravath assert that the district court has erroneously denied Cravath's petition to intervene in its own behalf as a party in the civil contempt hearing, for the purpose of asserting an attorney's work-product privilege against production of some of the documents and to require the district court to impose civil contempt sanctions upon Cravath or its partner, Mr. Bromley, so that it can obtain appellate review of the district court's rulings in connection with Pretrial Order No. 5.
 
 
 3
 Nos. 73-2145-6 is a petition for an extraordinary writ pursuant to 28 U.S.C. 1651 and Fed.R.App.P. 21 in which IBM asks us to direct Chief Judge Edelstein to vacate the contempt order.
 
 
 4
 It should be noted that a direct appeal from the district court to the Supreme Court under the Expediting Act, 15 U.S.C. 29, challenging the validity of Pretrial Order No. 5 is presently pending, appeal filed, 42 U.S.L.W. 3031 (U.S. Feb. 24, 1973) (No. 72-1173). There is also pending before the Supreme Court an extraordinary writ to review the district court's pretrial order, petition filed, 42 U.S.L.W. 3033 (U.S. June 11, 1973) (No. 72-1661), and a petition for a writ of certiorari to review International Business Machines Corp. v. United States, supra.
 
 
 5
 I. Character of the Contempt Order.
 
 
 6
 An order finding a party in criminal contempt is appealable. This is true because, in the language of the Supreme Court in Bloom v. Illinois,391 U.S. 194, 201, 88 S.Ct. 1477, 1481, 20 L.Ed.2d 522 (1968), '(c)riminal contempt is a crime in the ordinary sense; it is a violation of the law, a public wrong which is punishable by fine or imprisonment or both.' See Gompers v. United States, 233 U.S. 604, 610, 34 S.Ct. 693, 58 L.Ed. 1115 (1914); Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 444, 31 S.Ct. 492, 55 L.Ed. 797 (1911). Hence an order punishing one criminally for contempt is a final judgment and review may immediately be obtained. Union Tool Co. v. Wilson, 259 U.S. 107, 111, 42 S.Ct. 427, 66 L.Ed. 848 (1922); Bessette v. W. B. Conkey Co., 194 U.S. 324, 336-338, 24 S.Ct. 665, 48 L.Ed. 997 (1904). The procedure in relation to criminal contempts is prescribed by 18 U.S.C. 401 and 402 and Fed.R.Crim.P. 42. Appeals from criminal contempt orders are governed by Fed.R.Crim.P. 37. See generally Dobbs, Contempt of Court: A Survey, 56 Cornell L.Rev. 183, 235-45 (1971).
 
 
 7
 Generally speaking, however, an order of civil contempt is interlocutory and may not be challenged on an appeal until the entry of final judgment. Fox v. Capital Co., 299 U.S. 105, 107, 57 S.Ct. 57, 81 L.Ed. 67 (1936) (supplementary proceedings; contempt for failure to disclose assets); Doyle v. London Guarantee Co., 204 U.S. 599, 608, 27 S.Ct. 313, 51 L.Ed. 641 (1907). See also Mulligan, J., dissenting in International Business Machines Corp. v. United States, 471 F.2d 507, 519 n.3 (2d Cir. 1972) (panel decision reversed en banc).[1]
 
 
 8
 Appellant IBM argues first that Judge Edelstein's contempt order, although styled as a 'civil' order, is in reality a criminal contempt order and is hence appealable. This argument has three underlying premises: (1) vindication of a court's authority is a characteristic of criminal, not civil, contempt and such was the purpose of the order here; (2) if the order were civil, it could not be entered without consideration of 'the character and magnitude of the harm threatened by continued contumacy,' United States v. UMW, 330 U.S. 258, 303-304, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947); and (3) the severity of the penalties imposed here, i.e., $150,000 per day for noncompliance, is so great that necessarily the contempt order is criminal.
 
 
 9
 None of these premises are correct. The hallmark of civil contempt is that the sanction imposed is only contingent and coercive. Shillitani v. United States, 384 U.S. 364, 370, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966); Penfield Co. v. SEC, 330 U.S. 585, 590, 67 S.Ct. 918, 91 L.Ed. 1117 (1947); United States v. UMW, 330 U.S. at 303, 67 S.Ct. 677, 91 L.Ed. 884; Gompers v. Bucks Stove & Range Co., 221 U.S. at 442, 31 S.Ct. 492, 55 L.Ed. 797. See Dobbs, 56 Cornell L.Rev. at 237. Civil contempt, moreover, has a remedial purpose-- compelling obedience to an order of the court for the purpose of enforcing the other party's rights, or obtaining other relief for the opposing party. Nye v. United States, 313 U.S. 33, 42, 61 S.Ct. 810, 85 L.Ed. 1172 (1941); McCrone v. United States, 307 U.S. 61, 64, 59 S.Ct. 685, 83 L.Ed. 1108 (1939); Gompers v. Bucks Stove & Range Co., 221 U.S. at 441, 31 S.Ct. 492, 55 L.Ed. 797. The distinction between civil and criminal contempt is, in short, 'usually based on the purpose for which the contempt sentence is meted out.' Dobbs, 56 Cornell L.Rev. at 235.
 
 
 10
 The district court did not leave in doubt the purpose which the contempt citation here was to serve. The order, dated August 1, 1973, makes it clear that the fine is for each day that IBM 'fails to comply with Pretrial Order No. 5' and that IBM is 'entitled to purge itself of this contempt at any time' by compliance with the discovery order. The order of July 10, 1973, requiring that the hearing proceed in respect to the possibility of contempt, clearly states that the hearing is to be 'on the issue of a coercive fine . . ..' Thus the order was both coercive and contingent, indicating a civil rather than criminal contempt.
 
 
 11
 In regard to the amount of the coercive fine it was proper for the court to take into account the contemnor's resources and ability to pay. This it did, noting in the contempt order that its 1972 annual report showed earnings for that year in excess of $1,279,000,000 as against $1,078,000,000 in 1971 and that the stockholders' equity as of December 31, 1972, was reported at $7,565,000,000. While $150,000 a day is a substantial sum, in reference to IBM's financial resources and the consequent seriousness of the burden to IBM, the sum represents only 5 per cent of any given day's earnings.[2] In any case, we fail to see how the magnitude of such a sum can turn a civil contempt into a criminal one, any more than the sending of an individual to jail turns a civil contempt into criminal contempt. See Shillitani v. United States, 384 U.S. at 370, 86 S.Ct. 1531, 16 L.Ed.2d 622. In neither case does the severity of the penalty change the nature of the contempt. See Gompers v. Bucks Stove & Range Co., 221 U.S. at 443, 31 S.Ct. 492. It is not as if there were any punitive aspect in this contingent fine. Indeed, this is a classic case of using the court's power to afford 'full remedial relief,' McComb v. Jacksonville Paper Co., 336 U.S. 187, 193, 69 S.Ct. 497, 93 L.Ed. 599 (1949), so as to enforce the right of the opposing party-- here the right to discover certain documents.
 
 
 12
 IBM also claims that language in United States v. UMW, supra, compels a finding of criminal contempt here. There the Court said that a court imposing a civil, coercive fine 'must . . . consider the character and magnitude of the harm threatened by continued contumacy . . ..' 330 U.S. at 304, 67 S.Ct. at 701. Several independent reasons militate against our concluding that the district court's failure explicitly to weigh this consideration turns what would otherwise be civil contempt into a criminal contempt. First, it must be noted that the Government in the July 16, 1973, hearing attempted to offer evidence of the harm to it by continued refusal by IBM to comply with the court's order. IBM objected to the introduction of that evidence, and the objection was sustained. (Tr. 35-40.) Thus, even if IBM had a right to consideration by the court of the harm to the Government, it waived that right by objecting to the evidence of it.[3] Second, there is no reason to believe that a contempt order which is styled civil by the judge imposing it, which has a clearly civil purpose and which was imposed only after consideration of questions relevant only to civil contempt, would become criminal by failure to find explicitly with reference to one of the civil considerations. In other words, were we to read the language in the UMW case to require an explicit finding as to harm in all coercive, civil contempts, we still would not treat a failure to make such a finding as converting the civil contempt to a criminal contempt, which is essentially what IBM would have us do here. Third, in any case, we do not so read the language in the UMW case, The so-called requirement-- that a court consider the harm of continued contempt-- first appeared in United States v. UMW, and there it was propounded without explanation or citation. No case is cited to us where a civil, coercive contempt was voided for failure to meet this 'requirement,'[4] nor do civil, coercive contempts always involve such findings. See, e.g., NLRB v. Teamsters Local 282, 438 F.2d 100 (2d Cir. 1970); NLRB v. Teamsters Local 676, 450 F.2d 413 (3d Cir. 1971); NLRB v. Lynair, Inc., 380 F.2d 286 (6th Cir. 1967). We read this language in UMW as requiring that the coercive fine be reasonably set in relation to the facts, that it not be arbitrary. Judge Edelstein's memorandum is evidence that his decision was reasoned and that he gave consideration to the various factors which led to this particular fine-- the ability of IBM to meet these payments without undue hardship and the imposition of a fine stiff enough to bring about expeditious compliance. Indeed, unlike the violation of a labor injunction, it is impossible to determine what harm is being suffered here by failure to provide this material for discovery. It may be worthless, or, more likely in view of the Government's offer of proof, it may be relevant and worthwhile, but to expect a finding of the 'character and magnitude of the harm' involved in withholding essentially unknown documents would be to expect miracles of the court-- indeed, would involve a prejudgment of the case on the merits. Fourth, and finally, the court's failure to make such a finding at worst would only go to the amount of the coercive fine, not to the merits of the civil contempt itself. In light of IBM's often stated intention that it will comply with a definitive ruling on the Pretrial Order, rather than stand in contempt, no matter how nominal the fine, there would be little point in delaying the process by remanding for reconsideration of the amount of the fine.
 
 
 13
 II. Appealability of a Civil Contempt Order.
 
 
 14
 IBM argues next that even if the contempt here were civil in nature, it would be appealable under a decision of this court, New York Telephone Co. v. Communications Workers, 445 F.2d 39 (2d Cir. 1971), and then, if we were to apply the Expediting Act so to prevent appealability here, it would be unconstitutional under Reisman v. Kaplan, 375 U.S. 440, 84 S.Ct. 508, 11 L.Ed.2d 459 (1964). In New York Telephone Co., supra, however, the court specifically noted that, even though the union was adjudged in civil contempt, the main action in which the order had been issued had effectively been terminated, so that the civil contempt adjudication being appealed from was no longer interlocutory. The court said: '. . . we doubt that anything further remains of the main action unless the district court grants leave to replead. Accordingly, our intervention by way of appeal runs no risk of disrupting the orderly course of proceedings below.' 445 F.2d at 45. Fox v. Capital Co., supra, and Doyle v. London Guarantee Co., supra, both involved orders to produce books and records in civil proceedings and resulted in civil contempts. These were held to be interlocutory only and not appealable. This continues to be the law in this circuit, Vincent v. Teamsters Local 294, 424 F.2d 124 (1970); Dickinson v. Rinke, 132 F.2d 884 (1943), as well as in other circuits. See Hughes v. Sharp, 476 F.2d 975 (9th Cir. 1973); Hodgson v. Mahoney, 460 F.2d 326, 327 (1st Cir.), cert. denied, 409 U.S. 1039, 93 S.Ct. 519, 34 L.Ed.2d 488 (1972); SEC v. Naftalin, 460 F.2d 471, 475 (8th Cir. 1972); Firemen's Fund Insurance Co. v. Myers, 439 F.2d 834, 838 (3d Cir. 1971); Southern Railway Co. v. Lanham, 403 F.2d 119, 124 (5th Cir. 1968).
 
 
 15
 Our own opinion, moreover, in International Business Machines Corp. v. United States, 480 F.2d 293, supra, is clear in saying that the Expediting Act, 15 U.S.C. 29, deprives this court of jurisdiction to hear an appeal from an interlocutory order. See also Tidewater Oil Co. v. United States, 409 U.S. 151, 173-174, 93 S.Ct. 408, 34 L.Ed.2d 375 (1972). We fail to see why an interlocutory order of civil contempt is not equally included within the Expediting Act's prohibition. Cf. United States Alkali Export Association v. United States, 325 U.S. 196, 203, 65 S.Ct. 1120, 89 L.Ed. 1554 (1945). Reisman v. Kaplan, supra, is simply not applicable to this case. There the claim was that the IRS's summons machinery should be enjoined as to plaintiff because the summons sought material which incriminated him and also unlawfully appropriated the attorney's work product. The Supreme Court denied the injunction, because there was already adequate judicial review of the IRS's summons in a contempt proceeding, which was the only means to enforce the summons. Indeed, Reisman is contrary to IBM's case, because it stands for the adequacy of the judicial review in a contempt proceeding itself. In passing, the Court noted that a finding of civil or criminal contempt enforcing the summons would be appealable. This is so, and not surprisingly,[5] because it would not be interlocutory. It would be the final order of the only proceeding before the court, which is certainly not the case here.[6]
 
 
 16
 The rule of Fox v. Capital Co., supra, and Doyle v. London Guarantee Co., supra, is not affected by the authorities cited to us and this is as it should be, because discoverty orders at the pretrial stages of litigation are especially inappropriate for interlocutory appeals, as this court has recognized. Weight Watchers of Philadelphia v. Weight Watchers International, Inc., 455 F.2d 770, 773-774 (2nd Cir. 1972); American Express Warehousing, Ltd. v. Trans-America Insurance Co., 380 F.2d 277, 280-281 (2nd Cir. 1967). IBM makes a very emotional and rather heartwarming appeal relating to the sanctity of the attorney-client privilege and of the attorney's work-product and how-- absent appealability in a civil contempt proceeding-- they would be subject to invasion in the district court.[7] This emotional appeal, however, must be recognized for what it is-- an attempt to provide a right of appeal of all discovery orders, for the same legal arguments IBM makes here with respect to its perhaps unique factual situation apply equally to the run-of-the-mill objections to discovery orders. And, indeed, attorney-client privilege and work-product are among the more common grounds of objection. The considerations advanced by IBM for review as well as the considerations to the contrary were well considered by this court in a not dissimilar situation in American Express Warehousing, Ltd. v. Transamerica Insurance Co., supra. There too a judge had ordered production of documents which appellants claimed were work-product. This court stated:
 
 
 17
 The rule of non-appealability is no different when a claim of attorney's work-product . . . is made. Counsel have not cited, nor have we been able to find, a single case where an assertion of work-product, either accepted or rejected by the district court, so colored the case as to cause an appellate court to assert jurisdiction in contravention of the normal rule against appealability of discovery orders . . ..
 
 
 18
 . . . .so
 
 
 19
 . . . We do not think that the mere possibility of erroneous application of the Hickman principle to a given set of documents raises a spectre of such dire consequences that immediate appellate review as of right must follow. For such would be the inescapable conclusion if this appeal were allowed.
 
 
 20
 380 F.2d at 281. In short, the conclusion is and has been that, barring certain extraordinary circumstances, the possibility of abuse and injustice would actually be increased by opening wide the gates of review to discovery orders, than by leaving the determination ot the wise discretion of experienced trial judges.[8]
 
 
 21
 It is not as if we leave IBM without any possible remedy. As noted above, it has an appeal and two petitions before the Supreme Court at this time, and, finally, it may comply with the order and later appeal any final judgment to have its documents returned, or it may pay the fine and after final judgment or settlement appeal for the return of its money.[9]
 
 
 22
 III. The Government's Change of Position.
 
 
 23
 IBM also suggests an argument that because the Government has at various times before this court or in the Supreme Court specifically stated that the only way to obtain review of Pretrial Order No. 5 before the end of the case was for IBM or its representative to risk contempt, and thereby demonstrate its good faith and a solid basis of objections, the Government should be foreclosed from asserting nonappealability here. While we do not approve of the Government's attempt to mislead IBM, if that is what it was, appellate jurisdiction cannot be conferred on a court of appeals by consent, Stratton v. St. Louis Southwestern Railway Co., 282 U.S. 10, 18, 51 S.Ct. 8, 75 L.Ed. 135 (1930), or by waiver, United States v. Griffin, 303 U.S. 226, 229, 58 S.Ct. 601, 82 L.Ed. 764 (1938).
 
 
 24
 IV. Procedure Below.
 
 
 25
 Finally, IBM argues that manifest error and deprivation of due process in the proceedings below require us to direct the court below to vacate the contempt order under this court's All Writs Act power. This error, it is claimed, included a refusal to hold a hearing requested and required under Local Civil Rule 14 regarding the 'alleged misconduct' involved, as well as the omission to hold the hearing required by Rule 42(b). The argument is that we have jurisdiction under the All Writs Act, 28 U.S.C. 1651, to correct these abuses, it being urged that a pre-enforcement challenge will speed the action as in Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). These claims border on the frivolous. IBM received ample notice of the claim against it. It was given a full opportunity to present evidence, which it declined. In any case, Local Rule 14(b) provides that only 'If the alleged contemnor puts in issue his alleged misconduct . . . he shall upon demand therefor, be entitled to have oral evidence taken thereon . . ..' Here IBM admitted all of the facts necessary for the determination of contempt, namely, that it had failed to produce the documents required by Pretrial Order No. 5, and that it was not beyond its power to produce them. The record is replete with references to IBM's willingness to produce the documents if there were a final determination that it should produce them. The trial court, in separating the issue of a coercive fine from the Government's claim of damages, and refusing to hear the latter or to take evidence thereon or to conduct discovery in connection therewith, did not harm IBM in any manner, shape or form. At no point has IBM denied its failure to comply with the pretrial order, even though it has claimed that legally the court should not impose a sanction against it. But even if we are wrong, there is no jurisdiction for us to issue an all-purpose writ under International Business Machines Corp. v. United States, 480 F.2d 293 supra, in its construction of the Expediting Act. And, of course, in no event was the judge required to hold the hearing required in the case of criminal contempt by Fed.R.Crim.P. 42(b).
 
 
 26
 V. Intervention by Cravath.
 
 
 27
 We agree with the Government that Cravath's attempted intervention in the contempt proceeding is not properly before this court. The application for intervention was never determined by the court below, because the application was not filed until the morning of the hearing on July 16, 1973. The intervention motion attempted to substitute the Cravath firm for IBM apparently on the ground that it was Cravath's decision rather than IBM's which led to the non-compliance with Pretrial Order No. 5. We feel, however, as was repeatedly stated, that the true purpose was to permit the lawyers to be adjudged in token contempt to provide an appellate vehicle and thereby escape the thrust of International Business Machines Corp. v. United States, 480 F.2d 293 supra. In any event, intervention questions like every other aspect of Government civil antitrust cases are reviewable only in the Supreme Court on direct appeal under the Expediting Act. See United States v. California Cooperative Canneries, 279 U.S. 553, 49 S.Ct. 423, 73 L.Ed. 838 (1929). There is no doubt that the Supreme Court may consider a direct appeal from such a denial. See, e.g., Nader v. United States, 410 U.S. 919, 93 S.Ct. 1363, 35 L.Ed.2d 582 (1973).[10]
 
 
 28
 We dismiss the appeal and deny the petition for mandamus.
 
 TIMBERS, Circuit Judge (dissenting):
 
 29
 IBM has been ordered to pay to the United States a continuing fine in excess of $1,000,000 per week for alleged contempt.
 
 
 30
 Its alleged contempt is for having respectfully declined to produce for the government's inspection some 1200 documents which concededly are attorney-client communications. IBM's claim of privilege was rejected out of hand by the district court-- without an opinion, without findings of fact, without any examination whatsoever of the documents in question. IBM's claim of privilege with respect to those documents has never been judicially reviewed, despite its repeated assurances of willingness to comply with an appellate determination of its claim of privilege. Indeed, the contempt adjudication below was sought by IBM itself for the express purpose of obtaining precisely that judicial review of its claim of privilege which the government on at least four occasions had advised the Supreme Court and our Court was the only way that IBM in good faith could obtain such review before the end of the case.[1]
 
 
 31
 The narrow question presently before us is whether the district court's contempt adjudication was civil or criminal. All agree that if it was criminal, the contempt adjudication is appealable to our Court now, since it is a final judgment in a proceeding separate from the antitrust action. The majority, by adopting its own reading of United States v. UMW, 330 U.S. 258 (1947), would ignore the Supreme Court's requirement that a district court in imposing a civil, coercive fine 'must . . . consider the character and magnitude of the harm threatened by continued contumacy . . ..' 330 U.S. at 304. In the instant case, the district court's contempt order was not based upon any such consideration whatsoever. The majority so concedes. But the majority also blinks at the district court's omission of this indispensable requirement for a civil contempt adjudication on the ground, among others, as the majority puts it, that the Supreme Court's 'so-called requirement-- that a court consider the harm of continued contempt-- first appeared in United States v. UMW, and there it was propounded without explanation or citation.' Supra, p. 116. I think this is an exceedingly slender reed upon which to deny appellate review of a contempt order which imposes a continuing fine of a million dollars per week.
 
 
 32
 In light of the undisputed underlying facts which led to the district court order which is the basis for the contempt adjudication below, I would hold the contempt order to be criminal in nature and as such reviewable now by our Court. Since IBM has never waived its attorney-client privilege with respect to the documents in question, I would vacate the production order and remand the case to the district court with instructions to rule on the yet-to-be-ruled-on claim of privilege.
 
 UNDISPUTED UNDERLYING FACTS
 
 33
 The underlying facts and prior proceedings that led to the district court's production order which in turn is the basis for the district court's contempt adjudication are uncontroverted. While the majority omits any reference to these underlying facts, in my view they are central to an understanding of the critical issue now before us.[2]
 
 
 34
 On January 17, 1969, the United States commenced a civil action in the Southern District of New York, alleging that IBM had violated Section 2 of the Sherman Act. 15 U.S.C. 2 (1970). A number of private antitrust actions also were instituted against IBM. These private actions were transferred pursuant to 28 U.S.C. 1407 (1970) to the District of Minnesota, were consolidated and were assigned to Judge Neville.
 
 
 35
 In the course of pretrial proceedings in one of the cases assigned to him, Control Data Corp. v. IBM (D.Minn.Civ. Action No. 3-68-312), Judge Neville on October 19, 1970 ordered that IBM accelerate its production of documents to Control Data. The magnitude of the IBM-Control Data document inspection program may be gleaned from the facts that IBM itself copied or microfilmed some 80 million Control Data documents and Control Data sent a staff of 61 persons to various IBM offices to inspect and copy IBM documents.
 
 
 36
 The accelerated schedule ordered by Judge Neville caused inevitable problems. IBM discovered, despite its careful pre-examination of documents for privilege, that certain privileged documents inadvertently were falling into Control Data's hands, including certain letters from IBM's counsel, Cravath, Swaine & Moore, to IBM officers and personnel. To make the screening process more effective, IBM placed a lawyer in its document storage room where Control Data was microfilming. His assignment was to make a final inspection of the documents selected by Control Data for copying and to withdraw any document believed to be privileged before Control Data copied it. Control Data in turn complained that this 'interceptor' seriously impeded its inspection schedule. It asked the court to remove him. In the interest of expedition, Judge Neville on November 2, 1970 did remove the interceptor. He did so, however, on the express condition that he 'would thereafter brook no argument that the privilege had been waived (by IBM) merely because the document had been seen by CDC and perhaps copied.'[3]
 
 
 37
 Subsequent to Judge Neville's order of November 2, 1970 expressly protecting IBM's right to assert its claim of privilege, the government in the Southern District action decided to abandon its own independent discovery program and to accept the documents IBM had furnished to Control Data in the Minnesota action. The government and IBM agreed that:
 
 
 38
 'IBM would first edit from the CDC microfilm (already delivered to CDC) documents for which privilege was claimed, and then supply the Government with a list showing the author, addressee, nature of privilege, date, file source and copyee for every document removed from the microfilm.[4]
 
 
 39
 Pursuant to this agreement, IBM supplied the government with a list of documents it had excised from the microfilm previously furnished to Control Data.
 
 
 40
 The government thereupon sought to repudiate the agreement on the ground that IBM was acting in bad faith in excising from the microfilm previously furnished to Control Data an unreasonable quantity of material before turning the microfilm over to the government. On April 7, 1972, the government made a motion in the Southern District action for an order requiring IBM to produce all material excised and withheld by IBM. The government argued that IBM's production of the documents to Control Data in the Minnesota action constituted a waiver of all claims of privilege with respect to those documents; and further that, since they were now 'in the public domain', the documents should be made available to the government in the Southern District action. In response, IBM contended that it did not waive its privilege by delivering the documents in the Minnesota action and furthermore that Judge Neville's order should be controlling.
 
 
 41
 After a hearing and oral arguments on May 12, 1972 and September 26, 1972-- but without any findings of fact, without any written opinion and without any examination of the documents in question-- Chief Judge Edelstein on September 26, 1972 in the Southern District action entered Pretrial Order No. 5 (hereinafter 'the production order'). This production order, which has provided the basis for all subsequent proceedings, directed that:
 
 
 42
 'IBM immediately deliver to plaintiff, in the form provided to Control Data Corporation, a copy of each document withheld and excised by it from the said microfilm, all such documents purportedly being identified and described by Charles M. Waygood, attorney for defendant, in a letter addressed to plaintiff's counsel, dated April 4, 1972, a copy of said letter being attached to and made a part of this order.'
 
 
 43
 It is for violation of this production order that IBM has been held in contempt.
 
 
 44
 Despite repeated efforts, IBM has not been able to obtain judicial review of this production order.[5] The closest it has come to obtaining such review was by the original panel of this Court in IBM v. United States, supra note 2, 471 F.2d at 517, which held that IBM had not waived its attorney-client privilege and directed that a new discovery order be entered providing for a judicial determination of the claim of privilege with respect to the documents withheld.[6]
 
 
 45
 Hence, in the present posture of this case, the underlying issues of whether the 1200 documents in question are privileged and whether IBM has knowingly and voluntarily waived its privilege as to them have not been judicially determined. There has been no determination whether the district court abused its discretion in compelling production of privileged documents which were expressly protected by the discovery order of Judge Neville. See IBM v. United States, supra note 2, 471 F.2d at 513. Moreover, not even the majority denies that the practical effect of the production order of September 26, 1972 is to deprive IBM of the right to assert its attorney-client privilege or voluntarily to waive it. Bluntly, IBM is being coerced into either sacrificing its attorney-client privilege-- a privilege it has zealously guarded-- or being held in contempt and required to pay a fine which has no relation either to the character of its alleged contumacious conduct or to the damage allegedly caused by its refusal to turn over the documents.
 
 
 46
 It is difficult to conceive of a more glaring instance of a wrong for which the law should provide a remedy-- unless that first lesson that some of us learned under the New Haven elms is to be totally discarded.
 
 CRIMINAL CONTEMPT ADJUDICATION BELOW
 
 47
 In my view, the contempt adjudication below was criminal in nature and as such is reviewable now by this Court.
 
 
 48
 True, the district court, in what strikes me as a transparent attempt to avoid appellate review, has larded its contempt order with all the civil contempt boilerplate-- including a coercive recital and a purge provision. Styling the order as civil does not make it such.
 
 
 49
 Viewed realistically, the clear purpose and effect of the order is criminal in nature. Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 441 (1911). See generally Dobbs, Contempt of Court: A Survey, 56 Cornell L.Rev. 183, 235-45 (1971). The purpose of the order is punitive-- to vindicate the authority of the court. By completely excluding the issue of damages in straining to frame a civil remedy, the district court first ignored the law of this Circuit, United States v. Aberbach, 165 F.2d 713, 715 (2 Cir. 1948) (Chase, J.), that a fine for civil contempt 'which bears some reasonable relation to the amount of this damage (to the government) might lawfully be imposed.' The court further ignored the requirement of United States v. UMW, 330 U.S. 258, 304 (1947), that in assessing a civil fine in order to assure compliance the court 'must . . . consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired.'
 
 
 50
 Moreover, the record is crystal clear that the district court's failure to comply with either of these indispensable requirements for a civil contempt adjudication was deliberate and not inadvertent. In its order of July 3, 1973 scheduling a hearing for July 16 'limited to the issues of the fine and damages to be assessed against (IBM) for its alleged contempt', the court excluded any consideration of the 'character and magnitude' of the threatened harm and the 'effectiveness' of any suggested sanction. Moreover, by its order of July 10, the court excluded from the July 16 hearing any consideration of the 'question of damages' caused by IBM's alleged contumacious conduct. Thus, the only evidence before the court was IBM's balance sheet.
 
 
 51
 The continuing fine imposed of more than a million dollars per week can be ascribed to nothing other than the court's arbitrary assessment of IBM's will power. The fine is wholly unrelated to any actual harm sustained by the government, to the character and magnitude of any harm threatened by continued contumacy, or to the probable effectiveness of any lesser sanction coupled with the option of a subsequent increase in the fine if compliance were not forth-coming.
 
 
 52
 To avoid what to me is the inescapable conclusion that IBM has been held in criminal contempt, the majority states that the district court 'did not leave in doubt the purpose which the contempt citation here was to serve.' Supra, p. 115. They say that 'the order was both coercive and contingent, indicating a civil rather than criminal contempt.' Ibid. With deference, the majority ignores both the district court's decision of July 10, 1973 emphasizing 'the desire of the court to insure that its (production order) be promptly obeyed', Memorandum of Decision of July 10, 1973, at 3, and the fact that the purpose to be accomplished by the order was not to remedy any harm sustained by the government.[7] The record before us is totally barren of any proof or any finding of harm. The remedy of a million dollar per week fine clearly demonstrates that its chief purpose was to vindicate the court's aurhority and to punish IBM if it failed to bow to the court's power.
 
 
 53
 The majority 's suggestion that the district court's failure to 'consider the character and magnitude of the harm threatened by continued contumacy', United States v. UMW, supra, 330 U.S. at 304, is of no importance, strikes me as a side-stepping of what I had thought, prior to today's majority opinion, to be a decision of the Supreme Court hinding upon our Court. The majority says that the district court's refusal to weigh this consideration does not transform 'what would otherwise be civil contempt into a criminal contempt.' Supra, p. 116. This ignores the stated purpose of the district court in holding IBM in contempt, and of the government in seeking to have it held in contempt. With due respect, I must say that the majority's strained reading of UMW as requiring merely 'that the coercive fine be reasonably set in relation to the facts, that it not be arbitrary', utterly emasculates that landmark decision of the late Chief Justice Vinson. How can a contempt fine be reasonably or non-arbitrarily set if the 'facts'-- i.e. the harm caused by the contumacious conduct, as well as the character and magnitude of that conduct-- are not even explored? It would have been no more impossible to determine the harm sustained in the instant case than it was to determine the harm caused by the nationwide coal miners' strike in UMW.[8] Furthermore, the district court's failure to consider this issue affects not merely the amount of the fine, as the majority suggests; it goes directly to the nature of the contempt adjudication. United States v. UMW, supra, 330 U.S. at 304.
 
 
 54
 Assuming arguendo that part of the district court's contempt order could be construed as civil in nature, the fact that any part of it was criminal in nature makes the entire order immediately appealable. Union Tool Co. v. Wilson, 259 U.S. 107, 110 (1922); In re Merchants' Stock and Grain Co., 223 U.S. 639, 642 (1912); In re Christensen Engineering Co., 194 U.S. 458, 461 (1904). The mere fact that the district court labeled the order as civil and adopted formal civil contempt boilerplate does not foreclose this Court from determining that at least part of the order was criminal in nature. The contempt adjudication below, even accepting arguendo the majority's criteria, surely was partially criminal because it cannot be gainsaid that it was not 'wholly remedial' but rather was intended, at least in part, 'as a deterrent to offenses against the public.' McCrone v. United States, supra, 307 U.S. at 64. The court having excluded evidence relating to whether the contumacy was injurious to the government, it is simply impossible to say that the order was wholly civil. Since the court did not consider the 'character and magnitude of the harm threatened', its order surely cannot be said to be 'wholly remedial'. And the court's statement in its Memorandum of Decision of July 10 that it wanted 'to insure that its (production order) be promptly obeyed', indicates at the very least a purpose to deter offenses committed against the court and the public.
 
 
 55
 In short, for this Court to deny appellate review of the district court's crushing million dollar per week fine imposed on IBM, and to do so in reliance upon the district court's specious characterization of the contempt order as civil in nature, represents in my view a grave perversion of long established principles of civil contempt. Although carefully labeled to forestall appellate review, the contempt order in every real sense was punitive and was intended to vindicate the authority of the court. Gompers v. Bucks Stove & Range Co., supra, 221 U.S. at 441. I would hold the contempt order to be criminal and immediately appealable to our Court. Such holding would in no way be inconsistent with our en banc decision in IBM v. United States, supra note 2, 480 F.2d at 293. It would, however, be wholly consistent with the proposition, which the majority does not deny, that the imposition of contempt based upon 'a blanket order as broad and sweeping as (the production order below) ought to receive appellate review before IBM is irrevocably deprived of its right to claim the attorney-client privilege.' IBM v. United States, supra note 2, 471 F.2d at 513.
 
 DOCTRINE OF INADVERTENT WAIVER
 
 56
 Since I believe that the contempt order is criminal in nature and therefore appealable, I would remand the case to the district court for a ruling by the panel of masters on the Claim of privilege asserted by IBM. Such a panel of masters has already been appointed by the district court specifically for the purpose of ruling on IBM's claims of privilege.[9]
 
 
 57
 It seems to me that this is one of those extraordinary cases which demands application of the doctrine of inadvertent waiver. Connecticut Mutual Life Ins. Co. v. Shields, 18 F.R.D. 448, 451 (S.D.N.Y.1955). The enormous number of documents to be produced, and the time pressures imposed by Judge Neville's order, made the inadvertent production of some privileged ones virtually inevitable. As Judge Neville stated in his order of April 18, 1972, supra note 3, 'The document inspection program was massive . . .. Certain confusion and errors were bound to result in such a strenuous program.' Taking waiver in its traditional sense, it is utterly untenable that IBM should be bound by the unintended result of its good faith efforts under these most extraordinary circumstances.
 
 
 58
 The production order below ignored the protective provisions of Judge Neville's prior order as well as the intent clearly manifested by the agreement between IBM and the government. When the parties agreed upon the 'second alternative' by which IBM would supply the government with documents, and when they so agreed in reliance upon the protective provisions of Judge Neville's order, clearly IBM intended to confer upon the government rights in the documents no greater than those conferred on Control Data by Judge Neville's order. The production order below is in direct conflict with Judge Neville's order. This results from the erroneous assumption by the district court below that IBM waived its privilege by delivery of documents to Control Data. It ignores the intent of the IBM-government agreement.
 
 
 59
 The production order not only rests upon the erroneous assumption that IBM waived its right to invoke its privilege in the Southern District action when it delivered the disputed documents to Control Data in the Minnesota action; it also is predicated upon the court's wholly unwarranted conclusion that 'the doctrine of inadvertent waiver cannot be countenanced because it would open a Pandora's box which would release enough devils that could possibly overwhelm the Court in this proceeding.' Transcript of September 12, 1973 Hearing, at 23-24. This conclusion that the circumstances of production are irrelevant and that it is of no consequence whether the privileged documents were produced inadverently, unintentionally or under compulsion is squarely inconsistent with a finding of waiver. In Johnson v. Zerbst, 304 U.S. 548 (1938), the Supreme Court made it very clear that a waiver 'is ordinarily an intentional relinquishment or abandonment of a known right or privilege.' 304 U.S. at 464. See Barker v. Wingo, 407 U.S. 514, 525-26 (1972). Here the district court made no finding that there was either an intentional or a voluntary disclosure of the documents by IBM. The record required a finding precisely to the contrary, for IBM had exercised every possible precaution to preserve its privilege. The district court was clearly erroneous in flatly refusing to consider the circumstances surrounding IBM's production in the Control Data case. The most crucial factor which the court ignored is that the government was not free to lift the discovery proceedings in the Minnesota private action out of context and to engraft them willy-nilly upon the Southern District government action.
 
 
 60
 Moreover, a holding that IBM did not waive its attorney-client privilege would neither create unnecessary litigation nor open a 'Pandora's box'. The production order both relates to Judge Neville's order and collaterally frustrates its most important provision, namely, that IBM's right to assert its attorney-client privilege with respect to the documents already delivered to Control Data shall remain unimpaired. This is not the 'run-of-the-mill' discovery order referred to by the majority. Supra, p. 118. It is indeed, as the majority observes, a 'unique factual situation'. Ibid.
 
 
 61
 Of even more importance than whether the district court below correctly ruled upon the attorney-client privilege, is the question whether a district court in one circuit has the power collaterally to attack the discovery order of a district court in another circuit upon the theory that production under a protective umbrella constitutes a general waiver. I would hold it does not.
 
 
 62
 To me nothing could be clearer than the invalidity of the production order below. It should be vacated.
 
 DENIAL OF CRAVATH'S INTERVENTION MOTION
 
 63
 Finally, I vigorously dissent from the majority's holding that the district court's refusal to act upon Cravath's attempted intervention in the contempt proceeding is not properly before this Court.
 
 
 64
 Contrary to the majority's holding, the district court's failure to act upon Cravath, Swaine & Moore's motion to intervene and its entry of an order inconsistent with the relief sought by that motion amounts to a denial of the motion. At least since Mosier v. Federal Reserve Bank of New York, 132 F.2d 710, 712 (2 Cir. 1942), we have recognized the basic propositions that 'the determination of a motion is not always expressed, but may be implied' and that 'the entry of an order inconsistent with granting the relief sought is a denial of the motion.' This has been consistently followed in this and other circuits. See, e.g., Clean Air Coordinating Committee v. Roth-Adam Fuel Co., 465 F.2d 323, 325 (7 Cir. 1972), cert. denied, 409 U.S. 1117 (1973); Weiss v. Duberstein, 445 F.2d 1297, 1299 (2 Cir. 1971). Cf. Abercrombie & Fitch v. Hunting World, Inc., 461 F.2d 1040, 1043-44 (2 Cir. 1972) (Timbers, J., concurring).
 
 
 65
 The majority does not disagree that the contempt adjudication below jeopardizes the rights which Cravath sought to protect by intervention. Since the order appealed from is inconsistent with the relief sought, the district court's failure formally to act on the motion is the same, for purposes of appellate review, as if the motion had been formally denied.
 
 
 66
 If I am correct that Cravath's motion to intervene as of right, by operation of law, was denied by the district court, it seems to me that the district court should be directed to permit Cravath to intervene. It is incontrovertible that Cravath meets the requirements of Fed.R.Civ.P. 24(a)(2) for intervention as of right. Cravath has shown that it has an 'interest relating to the property or transaction which is the subject of the (proceeding)'; that it 'is so situated that disposition of the (contempt proceeding) may as a practical matter impair or impede (its) ability to protect that interest'; and that its 'interest is (not) adequately represented by the existing party.' See Ionian Shipping Co. v. British Law Ins. Co., 426 F.2d 186, 189 (2 Cir. 1970).
 
 
 67
 The district court completely ignored Cravath's claim of personal interest in the documents claimed to be privileged. It refused even to consider Cravath's proposed intervention. It took the position that, since the application to intervene was submitted on the morning of the contempt hearing (July 16, 1973), it was not properly before the court. This does not explain why the court did not set a hearing date to consider Cravath's application, especially since the contempt order was not entered until more than two weeks later (August 1, 1973).[10] If IBM is coerced by the district court's contempt order into delivering to the government the privileged documents, then Cravath surely will be irreparably injured. Cravath's work-product privilege-- a privilege which the courts heretofore have zealously protected, see Hickman v. Taylor, 329 U.S. 495, 510-12 (1947)-- will be sacrificed unnecessarily, immediately and irreversibly.
 
 
 68
 The procedure by which Cravath sought, if permitted to intervene in the contempt proceedings, to obtain prompt appellate review of the basic claim of work-product privilege, happens to be analogous to the procedure which I suggested IBM follow in my earlier en banc dissenting opinion, supra note 2, 480 F.2d at 305:[11]
 
 
 69
 'One way to obtain prompt appellate review of the basic claim of attorney-client privilege would be for an appropriate officer or employee of IBM respectfully to refuse to comply with the district court's Pretrial Order No. 5. Direct appeal could then be taken to this Court from the district court's ensuing civil contempt order. While this would result in prompt adjudication of the claim of privilege, the author of this opinion surely can take judicial notice that such course of procedure would be neither acceptable nor pleasant, especially from the standpoint of the alleged contemnor even when represented by distinguished-- and effective-- counsel.'
 
 
 70
 And speaking of distinguished counsel, it may be appropriate to observe that the contempt proceedings below-- had Cravath's intervention motion not been rejected out of hand by the district court's expedient of ignoring it-- would have had the benefit of the expertise and wisdom of two of the most widely experienced and highly esteemed lawyers in the land: Honorable Bruce Bromley, formerly an Associate Judge of the Court of Appeals of the State of New York (who tendered himself as the contemnor), and Honorable Simon H. Rifkind, formerly a Judge of the United States District Court for the Southern District of New York (who sought to represent the contemnor).
 
 
 71
 It is precisely this caliber of professional competence which IBM and its counsel understandably want-- and which the federal judicial system should welcome-- in an adjudication involving one of the most fundamental rights indispensable to our system of law: the right of an attorney to complete privacy in his mental impressions and trial preparation. It is this fundamental right to which the Supreme Court referred in Hickman v. Taylor, 329 U.S. 495, 510 (1947):
 
 
 72
 'Not even the most liberal of discovery theories can justify unwarranted inquiries into the files and the mental impressions of an attorney.
 
 
 73
 Historically, a lawyer is an officer of the court and is bound to work for the advancement of justice while faithfully protecting the rightful interests of his clients. In performing his various duties, however, it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. That is the historical and the necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and to protect their clients' interests. This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways-- aptly though roughly termed by the Circuit Court of Appeals in this case as the 'work product of the lawyer."
 
 
 74
 And the Court in Hickman warned that if work product materials are thrown open to opposing counsel 'on mere demand', then
 
 
 75
 '. . . much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served.' Id. at 511.
 
 
 76
 In short, we are told that this case is one of the most important ever brought in the federal courts. The attorney-client privilege and the work-product privilege of which IBM and its counsel are being stripped without any adjudication and without judicial review are among the most fundamental rights long recognized in our jurisprudence. The principles here involved transcend in importance even the rights of the parties to this litigation. I think we have not only the jurisdiction but a plain duty to correct the clearly erroneous action of the district court below.
 
 
 77
 From the refusal of the majority to do so, I respectfully but most emphatically dissent.
 
 
 
 [1]
 Exceptions to this rule are rare, but where they occur it is because the interlocutory nature of the order is no longer present. Hence, civil contempts against non-parties are immediately appealable because the appeal does not interfere with the orderly progress of the main case. See United States v. Fried, 386 F.2d 691, 694 (2d Cir. 1967). Where the main case is effectively terminated, the contempt order may no longer be interlocutory. New York Telephone Co. v. Communications Workers, 445 F.2d 39 (2d Cir. 1971). Finally, where the contempt proceeding is the sole court proceeding involved, as is the case where administrative agencies attempt to enforce orders, the civil contempt is not interlocutory in any sense. Cf. O'Connor v. O'Connell, 253 F.2d 365, 366 (1st Cir. 1958)
 
 
 [2]
 While in absolute terms IBM's fine may seem large, the same percentage of earnings fine against one with a salary of $50,000 would be less than $7 per day
 
 
 [3]
 Apparently Judge Edelstein's exclusion of the Government's evidence arose from a confusion between the question of harm to the Government in determining the appropriate amount of the coercive fine and the question of actual damages suffered by the Government as a result of the delay for which a compensatory fine might be granted, the latter of which Judge Edelstein had postponed to a later hearing. Civil contempts may also include a compensatory fine based on the complainant's actual loss. See United States v. UMW, 330 U.S. 258, 304, 67 S.Ct. 677, 91 L.Ed. 884 (1947)
 
 
 [4]
 The cases cited by IBM supporting the need for an inquiry into harm all relate to compensatory fines, not coercive fines. See Boylan v. Detrio, 187 F.2d 375 (5th Cir. 1951); United States v. Aberbach, 165 F.2d 713 (2d Cir. 1948); McKee Glass Co. v. H. C. Fry Glass Co., 248 F. 125 (3d Cir. 1918); Christensen Engineering Co. v. Westinghouse Air Brake Co., 135 F. 774 (2d Cir. 1905)
 
 
 [5]
 See note 1 supra
 
 
 [6]
 Hickman v. Yaylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), also relied upon by IBM, did, to be sure, relate to the disobedience of an attorney in connection with documents prepared by him in anticipation of litigation. But as a reading of that case below discloses, there was an adjudication there of criminal, not civil, contempt. See 153 F.2d 212, 214 (3d Cir.). The issue of appealability was not even discussed in the Supreme Court opinion affirming the judgment of the court of appeals. 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451
 
 
 [7]
 The hardship involved is not a new one, nor has it been overlooked by courts
 It may be true, as said in argument, that . . . if the order cannot be reviewed until after final decree it may come too late to be of any benefit to the party aggrieved. But the power to punish for contempt is inherent in the authority of courts, and is necessary to the administration of justice and part of the inconvenience to which a citizen is subject in a community governed by law regulated by orderly judicial procedure.
 Doyle v. London Guarantee Co., 204 U.S. 599, 607, 27 S.Ct. 313, 315, 51 L.Ed. 641 (1907).
 
 
 [8]
 In American Express Warehousing, Ltd. v. Transamerica Ins. Co., 380 F.2d 277 (2d Cir. 1967), the posture of the case was an appeal directly from the discovery order rather than from a contempt order, but in terms of the policy considerations underlying the right to appeal there seems to us little difference, especially where in a case like this the contumacious conduct is deliberately undertaken so as to evade the rule against appealability, and thereby to attempt to gain by indirection what was unavailable directly
 
 
 [9]
 Cf. First Security National Bank & Trust Co. v. United States, 382 U.S. 34, 86 S.Ct. 157, 15 L.Ed.2d 28 (1965), reversing a civil contempt judgment against a defendant in a Government antitrust suit when the civil contempt order was entered after the judgment in the main action became final. See also Terminal Railroad Ass'n of St. Louis v. United States, 266 U.S. 17, 45 S.Ct. 5, 69 L.Ed. 150 (1924)
 
 
 [10]
 Cravath argues that the contempt petition should be treated as a separate action wholly apart from the main case, so as to take it outside the scope of the Expediting Act. We do not view the contempt hearing that way, but rather as integrally related to the underlying antitrust action in that the order is imposed to effectuate compliance with the discovery ordered in that case
 
 
 [1]
 See e.g., the government's Motion To Dismiss Or Affirm, at 15-16, filed in the Supreme Court in June 1973 in IBM v. United States, No. 72-1173:
 'If IBM is unwilling to await final judgment, it may refuse to comply with Pretrial Order No. 5 and risk sanctions under Rule 37(b)(2), Fed.R.Civ.P., including contempt. In the event of such a sanction against it, or its representative, IBM may be able to obtain judicial review before final judgment.' For similar representations in the instant litigation, see the government's Memorandum For The United States In Opposition (to Application for Stay), at 16, filed in the Supreme Court in June 1973; the government's Petition For Rehearing And Suggestion For Rehearing En Banc, at 8, filed in the Second Circuit in January 1973; and the government's Brief For The United States In Support Of Petition For Rehearing, at 9, filed in the Second Circuit in January 1973.
 
 
 [2]
 Familiarity with the prior opinions of this Court is assumed. IBM v. United States, 471 F.2d 507 (2 Cir. 1972) (panel decision); IBM v. United States, 480 F.2d 293 (2 Cir. 1973) (en banc)
 
 
 [3]
 Control Data Corp. v. IBM, supra, Order Re Claimed Waiver of Privilege, April 18, 1972, at 2-3 (summarizing prior proceedings in the Minnesota action)
 In this order of April 18, Judge Neville emphasized the condition which he imposed in connection with the removal of IBM's interceptor:
 'Neither IBM nor CDC shall be deemed to have waived the attorney-client or other privilege as to any document which heretofore has, or if reasonable precautions as in the past are taken hereafter may, come into the possession of any party to pending litigation . . ..'
 Furthermore, the court also emphasized in its order of April 18 that its position consistently had been that IBM had not waived its attorney-client privilege merely because a document had been seen by Control Data and perhaps copied. See Transcript of November 2, 1970 Hearing, at 48, 49.
 
 
 [4]
 In entering into this agreement, the parties rejected an alternative plan whereby IBM would deliver all the documents selected by Control Data and the governments would stipulate that IBM had not waived any claims of privilege as to the documents delivered. See IBM v. United States, supra note 2, 471 F.2d at 509
 
 
 [5]
 IBM appealed to this Court from the production order pursuant to 28 U.S.C. 1291 (1970). Concurrently it filed a petition for a writ of mandamus in this Court pursuant to 28 U.S.C. 1651 (1970). Initially, a divided panel of this Court held that it had jurisdiction over both the appeal and the petition, and ordered that the production order be vacated. IBM v. United States, supra note 2, 471 F.2d 507
 On petition by the United States, this Court granted a rehearing en banc and reversed the panel decision. In a 4-2 decision, we held that the Expediting Act, 15 U.S.C. 29 (1970), requires that appellate review of the production order be had, if at all, in the Supreme Court. Accordingly, we dismissed both the appeal and the petition for writ of mandamus. IBM v. United States, supra note 2, 480 F.2d 293. IBM on June 11, 1973 filed a petition for certiorari seeking review of our en banc decision. 41 U.S.L.W. 3658 (U.S. June 19, 1973) (No. 72-1662).
 While the above proceedings were pending in this Court, IBM on November 24, 1972 filed a protective notice of appeal to the Supreme Court from the district court's production order of September 26, 1972. That appeal was docketed in the Supreme Court on February 24, 1973. 41 U.S.L.W. 3477 (U.S. March 6, 1973) (No. 72-1173).
 On June 11, 1973, together with its petition for certiorari, IBM also filed in Supreme Court a petition for mandamus to review the production order. 41 U.S.L.W. 3658 (U.S. June 19, 1973) (No. 72-1661).
 On May 21, 1973, IBM moved in the district court for a further stay of the production order. The district court granted the stay until June 4.
 On June 1, an application for a continuation of the stay was made to Mr. Justice Marshall who, after hearing argument on June 4, granted a temporary stay subject to further order of the full Court. On June 13, the Supreme Court entered an order denying a stay of the production order and the mandate of this Court.
 On petition by the government filed June 25, 1973, the district court on August 1 entered the order presently before us holding IBM in contempt and directing it to pay a continuing fine of $150,000 per day. The district court refused to stay its contempt order and fine even for a single day.
 On August 2, upon application by counsel for IBM and by counsel for Cravath, Swaine & Moore, we stayed the district court's contempt order and production order until the argument of the instant appeals. We also expedited the appeals and heard them on August 8. At the conclusion of the arguments on August 8, we continued the stays until determination of the instant appeals.
 
 
 [6]
 although this 2-1 panel decision later was vacated by a 4-2 en banc decision of our Court, IBM v. United States, supra note 2, 480 F.2d 293, the en banc decision was limited to the holding that 'we have no jurisdiction to review the discovery order below either by appeal or by mandamus.' Id. at 295. The en banc Court did not purport to rule on the validity of the production order, including the refusal of the district court to make a judicial determination of the claim of privilege
 
 
 [7]
 The majority further ignores the purpose for which the government argued that the contempt order should issue. At the July 16, 1973 hearing, government counsel argued that IBM should be held in contempt because of the necessity 'to have a precedent in this Court that IBM will obey the Court's order and will obey them promptly and will obey them as they are directed to obey them and not on the basis of whether they want to or don't want to.' Transcript of July 16, 1973 Hearing, at 6. The government's purpose in seeking contempt clearly was to punish past conduct and to deter future conduct. This is a criminal sanction. McCrone v. United States, 307 U.S. 61, 64 (1939); MacNeil v. United States, 236 F.2d 149, 154 (1 Cir.), cert. denied, 352 U.S. 912 (1956); United States v. International Union, United Mine Workers, 190 F.2d 865, 873 (D.C.Cir.1951)
 
 
 [8]
 In United States v. UMW, 70 F.Supp. 42 (D.D.C.1946), modified and affirmed, 330 U.S. 258 (1947), although the severity of the harm caused by a nationwide coal miners' strike would appear to have been obvious, the government produced eight witnesses and substantial documentary evidence to justify the magnitude of the contempt adjudication and fine. The district court made findings of fact concerning the size of the existing stockpile of coal, the amount by which the rate of production decreased due to UMW's contempt, and the normal rate of consumption. In addition, the court received evidence and made detailed findings concerning the characteristics of the economy and of particular sectors thereof to establish exactly how the stoppage of coal production would cause damage and to what extent. Finally, the court made quantitative estimates as to the actual decline in national income and tax revenues which would result. 70 F.Supp. at 51
 This is a far cry from the total absence in the instant case of any evidence or finding in the district court of 'the character and magnitude of the harm threatened by continued contumacy.' United States v. UMW, supra, 330 U.S. at 304.
 
 
 [9]
 The panel of special masters appointed by the district court consists of Dean Joseph M. McLaughlin of the Fordham University Law School; Hon. Bernard S. Meyer, former Justice of the Supreme Court of the State of New York, Nassau County; and Jesse Climenko, Esq., the latter having been appointed on November 20, 1973 to replace Professor A. Leo Levin of the University of Pennsylvania Law School. N.Y.Law Journal, November 21, 1973, at 1
 
 
 [10]
 At the July 16 hearing, Judge Rifkind, counsel for Cravath, asked: 'When does your Honor want to hear the argument on my application for intervention?' The district court responded: 'I don't think that question comes with any particular good grace.' Transcript of July 16, 1973 Hearing, at 54-55
 
 
 [11]
 This course of procedure, as noted above, supra note 1, also was in accord with the suggestion which the government made on at least four occasions to the Supreme Court and to our Court-until 'Something . . . Happened On The Way To The Forum' below