**In the Matter of GRAND JURY PROCEEDINGS.**

**In re GRAND JURY EMPANELLED, JANUARY 21, 1975.**

**Misc. No. 75–11.**

United States District Court,
D. New Jersey.

Aug. 1, 1975.

Jonathan L. Goldstein, U.S. Atty., Andrew R. Jacobs and Frank C. Razzano, Asst. U.S. Attys., Newark, N.J., for the U.S.

Amster & Levin, P.A., by Richard A. Levin, Newark, N.J., Wolf, Block, Schorr & Solis-Cohen by Howard Gittis, Philadelphia, Pa., for petitioner.

OPINION

WHIPPLE, Chief Judge.

On June 18, 1975, a subpoena *duces tecum* was delivered to the law offices of

Freedman, Borowsky and Lorry, directing an appropriate representative to produce before the grand jury certain books, papers and records. On July 11, 1975, Abraham E. Freedman (hereinafter petitioner) filed a motion to quash the subpoena. After oral argument on July 14, 1975, this Court denied the motion and petitioner was directed to produce all of the records described in the subpoena the next morning. On July 15, 1975, petitioner appeared before the grand jury and refused to produce the subpoenaed records on the ground that, *inter alia,* the production of such materials would be in violation of the self-incrimination provision of the fifth amendment to the Constitution. The United States moved this Court, at that time, to hold petitioner in civil contempt.

It was the ruling of this Court that petitioner be required to produce the subpoenaed records, in camera, on July 16, 1975. On that date, petitioner failed to produce the records in question and, after oral argument, this Court adjudged petitioner to be in civil contempt pursuant to 28 U.S.C. § 1826. The Court ordered that petitioner be placed in custody and be fined the sum of $1,500.00 daily until such time as he produced the records in question. The sentence was immediately suspended "until further order of this Court pending disposition of other issues which have been raised in this cause." The Court also ordered that a hearing be held on July 23, 1975 to determine whether petitioner should be held in criminal contempt.

On July 17, 1975, petitioner filed a notice of appeal to the Third Circuit Court of Appeals from this Court's adjudication and sentence of contempt.

On July 22, 1975, petitioner filed with the Third Circuit Court of Appeals an application for a stay of the hearing scheduled for July 23, 1975, pending appeal. On July 22, 1975, the Third Circuit, while denying petitioner's motion for a stay, entered an Order reversing the Order of this Court directing petitioner to produce the subpoenaed records. The Court of Appeals further reversed this Court's Order of Contempt, without prejudice to the rights of the United States to reinstitute contempt proceedings following the evidentiary hearing then scheduled to begin July 23, 1975.

An evidentiary hearing concerning the basis for petitioner's assertion of the fifth amendment privilege was held on July 24, 1975. Also the subject of inquiry at the hearing was petitioner's contention that he may have been the subject of illegal surveillance by the United States.

## FINDINGS OF FACT

1. Petitioner is an attorney-at-law (T–7).

2. Petitioner was admitted to the Bar of the Commonwealth of Pennsylvania in 1933 (T–84).

3. In approximately 1934, petitioner formed the law firm of Freedman, Goldstein and Pechner of Philadelphia, representing itself to third parties and to the public as partners (T–88).

4. From 1938 to 1944, petitioner practiced as a member of the firm of Freedman and Goldstein. During that time, Freedman and Goldstein held themselves out as partners to the public and to third parties (T–91).

5. From 1944 to 1962, petitioner practiced law as a member of the firm of Freedman, Landy and Lorry, holding the firm out during that time as a partnership to third parties and to the public (T–92).

6. The law firm of Freedman, Borowsky and Lorry, which is the successor firm to Freedman, Landy and Lorry, came into existence in 1962. Between 1962 and the present, petitioner and others, including Wilfred Lorry, have represented themselves to third parties and the public as partners in that firm. The firm is located at 5th and Chestnut Streets, Philadelphia, Pennsylvania (T–34).

7. There are two categories of lawyers employed at Freedman, Borowsky and Lorry, salaried and profit-sharing. The profit-sharing attorneys are held out to third parties and the public as partners (T–95, 97).

8. From 1934 to date, petitioner and other so-called profit-sharing attorneys have referred to or represented their association with various law firms, including their present association with Freedman, Borowsky and Lorry, and its predecessor firm, Freedman, Landy and Lorry, as a partnership and have made this reference orally and in writing (T–10, 11).

9. Throughout the period 1934 to date, petitioner has never entered into any formal partnership agreement, written or oral, with any of the attorneys with whom he has been associated (T–88, 90, 92, 94, 170).

10. Petitioner is a member of the Advisory Committee of the United States Supreme Court on Admiralty Rules and Civil Rules. In connection therewith, he holds himself out to the Supreme Court of the United States as a member of the firm of Freedman, Borowsky and Lorry (T–70, 71).

11. Petitioner is a member of the bars of the 2nd, 3rd, 4th, 5th and 6th Circuit Courts of Appeals, the Supreme Court of Pennsylvania, and the Court of Appeals of the State of New York (T–85).

12. Petitioner has throughout his legal career remained a member in good standing of all Bars to which he has been admitted (T–87).

13. Petitioner is a member of the American, Philadelphia, Pennsylvania and New York Bar Associations (T–85).

14. Petitioner is a fellow and past president of the International Academy of Trial Lawyers, fellow and former member of the Board of Governors of the American College of Trial Lawyers, and a permanent member of the judicial conferences of the 3rd and 4th Judicial Circuits (T–85, 86).

15. The admission fees paid to the various courts of which the petitioner has become a member were paid out of the firm account of Freedman, Borowsky and Lorry (T–110).

16. The expenses of petitioner incurred at the Judicial Conferences of the 3rd and 4th Circuits were paid by the law firm of Freedman, Borowsky and Lorry (T–111).

17. The law firm of Freedman, Borowsky and Lorry is one of the largest law firms in the United States in the field of maritime and admiralty law (T–200).

18. The law firm of Freedman, Borowsky and Lorry holds itself out to the general public and the legal profession as a law firm consisting of 12 members and 9 associates (T–41).

19. Presently, the law firm of Freedman, Borowsky and Lorry has approximately 50 employees other than attorneys (T–34). It maintains offices in Philadelphia, Pennsylvania, and New York City (T–34, 35, 36).

20. Petitioner alone determines the salaries or share of profits of each lawyer employed at Freedman, Borowsky and Lorry and consults with no one in making this determination (T–95, 172).

21. Petitioner alone decides when a lawyer employed at Freedman, Borowsky and Lorry shall begin to receive as compensation a share in profits (T–98).

22. Upon becoming a profit-sharing employee at Freedman, Borowsky and Lorry, a lawyer makes no capital contribution (T–98).

23. Petitioner assigns all matters for handling by both profit-sharing and salaried lawyers or designates another attorney to discharge this function. Petitioner has, on occasion, taken assignments away from profit-sharing lawyers (T–101).

24. When a lawyer terminates his association at Freedman, Borowsky and Lorry, he may take with him only his personal files authorized by petitioner (T–101, 172).

25. The law firm of Freedman, Borowsky and Lorry leases its office premises in Philadelphia, Pennsylvania, in the firm's name, from Reid and Stambaugh, a Pennsylvania corporation. In its lease of October 8, 1965, Freedman, Borowsky and Lorry is described as a Pennsylvania partnership. The lease is signed by Abraham E. Freedman, Wilfred Lorry and Milton Borowsky as partners of the law firm (T–13)(G–2).

26. Petitioner negotiated the terms of said lease for the office to include the designation of Freedman, Borowsky and Lorry as a Pennsylvania partnership (T–15)(G–2).

27. Petitioner caused to be included in the lease a provision limiting the liability of the partnership (T–18)(G–2).

28. In a letter dated October 18, 1965 from Reid and Stambaugh to the law firm of Freedman, Borowsky and Lorry, requesting approval of additional terms in the lease, acceptance was made on behalf of the law firm by Abraham E. Freedman as a partner of the firm (T–20)(G–2).

29. The law firm has stationery on which the firm name of Freedman, Borowsky and Lorry is prominently displayed with the legend "Counsellors at Law and Proctors in Admiralty". Said stationery sets forth the names of the attorneys in the firm together with the addresses of the firm's offices in Philadelphia and New York (T–44).

30. The law firm of Freedman, Borowsky and Lorry has 3 bookkeepers who maintain the firm's books and records on the premises (T–41, 42).

31. Petitioner does not know or is unsure of what types of financial books and records are maintained by the law firm of Freedman, Borowsky and Lorry (T–60–67).

32. The financial records of Freedman, Borowsky and Lorry are maintained in the bookkeeper's office under lock and only petitioner and the bookkeeper have access keys (T–103, 171).

33. Members of the firm of Freedman, Borowsky and Lorry have access to ledger sheets of only the cases they are handling and consult with the bookkeeper concerning the financial aspects of these cases (T–103).

34. The law firm of Freedman, Borowsky and Lorry has three bank accounts in the firm name, including one at the Central Pennsylvania National Bank, and two at the Continental Bank (T–42).

35. Bills sent out for legal services performed by members of the firm are sent out in the name of Freedman, Borowsky and Lorry, at the direction of various attorneys in the firm (T–74, 75).

36. Remuneration for the legal services is made payable to the law firm and deposited in bank accounts in the firm's name (T–75).

37. The law firm of Freedman, Borowsky and Lorry may have purchased municipal bonds with monies of the firm (T–46).

38. The law firm of Freedman, Borowsky and Lorry has purchased in the firm name bonds of the Commonwealth of Pennsylvania (T–48).

39. The law firm of Freedman, Borowsky and Lorry has purchased State of Israel Bonds for several years in the firm name (T–48).

40. Freedman, Borowsky and Lorry has an organizational structure whereby a member of the firm assigns various cases to profit-sharing members and associates depending upon the potential recovery estimated in each case (T–198).

41. The monthly payroll of the law firm of Freedman, Borowsky and Lorry is at least $25,000.00 (T–49).

42. The law firm of Freedman, Borowsky and Lorry pays for its day-to-day services and bills, including monthly rental of office premises, telephone bill, xerox, etc., in the firm name with monies from bank accounts held in the name of Freedman, Borowsky and Lorry (T–50, 51).

43. Petitioner has no bank account of his own at the Continental Bank (T-51).

44. The law firm of Freedman, Borowsky and Lorry enters into agreements, including retainers for legal services, with clients in the firm name of Freedman, Borowsky and Lorry (T-54).

45. For the years 1970, 1971 and 1972, the total billings of the law firm of Freedman, Borowsky and Lorry were respectively $3,726,510.37, $3,331,986.59 and $3,337,819.16 (T-127) (G-10a, b, c).

46. $600,000 in bank certificates were purchased, probably in the firm name, for the purpose of paying the individual federal income taxes of each of the law firm's partners (T-46).

47. The assets of the law firm of Freedman, Borowsky and Lorry, including the desks, tables, typewriters, chairs, etc., were paid for from the law firm's account (T-112).

48. The law firm of Freedman, Borowsky and Lorry maintains a legal malpractice insurance policy in the firm's name, covering all of the lawyers in the firm. This insurance policy is paid for by the firm of Freedman, Borowsky and Lorry (T-79, 80).

49. The law firm of Freedman, Borowsky and Lorry pays Workmen's Compensation Insurance in the firm's name with firm monies (T-80).

50. The law firm of Freedman, Borowsky and Lorry makes payments on behalf of the firm to the Commonwealth of Pennsylvania Commission on Sales Tax (T-81).

51. The law firm of Freedman, Borowsky and Lorry carries group life insurance covering all of the profit-sharing attorneys in the firm and perhaps the salaried attorneys as well (T-81, 141).

52. The law firm of Freedman, Borowsky and Lorry makes payment in the firm name for Blue Cross, Blue Shield Medical Insurance for all of the members, associates and employees thereof (T-82).

53. The law firm of Freedman, Borowsky and Lorry has a retirement plan to which the firm makes contributions in the firm name (T-138).

54. The law firm of Freedman, Borowsky and Lorry may have held title to real estate in Philadelphia (T-45).

55. Petitioner himself refers to members of his firm as "partners", specifically testifying during the course of this hearing that "all partners share in the profits" (T-40).

56. The law firm of Freedman, Borowsky and Lorry holds itself out to the legal profession in *Martindale-Hubbell* as a law firm with 12 members and 9 associates (T-41).

57. Petitioner, Wilfred Lorry, Milton Borowsky, M. Vigderman, Joseph Weiner, Marvin Levin, Abram Adler, Marvin Barish, Charles Sovel, Bert Zibelman, Robert C. Daniels and Arnold Levin are listed in *Martindale-Hubbell* as members of the firm (T-39).

58. At least 1 member of the law firm of Freedman, Borowsky and Lorry has at various times, and in various ways, held himself out as a partner of the firm (T-23).

59. In correspondence to the Philadelphia Bar Association, at least one member of Freedman, Landy and Lorry, and its successor firm, Freedman, Borowsky and Lorry, held himself our as a partner of the firm and has referred to other members of the firm as partners (T-23).

60. In responding to complaints made to the Board of Censors of the Philadelphia Bar Association, members of the law firm of Freedman, Borowsky and Lorry specifically requested that complaints be viewed as a complaint against the firm rather than a complaint against an individual of the firm (T-30).

61. Wilfred Lorry is an attorney and member of the Bar of the Commonwealth of Pennsylvania (T-167).

62. Wilfred Lorry was associated in the full-time practice of law with petitioner from 1944 to 1967 (T–169).

63. Since 1944, Wilfred Lorry's name has been used together with petitioner's name in their association; from 1944 to 1962 as "Freedman, Landy and Lorry", and from 1962 to date as "Freedman, Borowsky and Lorry" (T–170).

64. In written and oral representations to the public and the legal profession, Wilfred Lorry, pursuant to his agreement with petitioner, held himself out as a partner in the law firm of Freedman, Borowsky and Lorry (T–186).

65. Wilfred Lorry held himself out to be a partner in the firm of Freedman, Borowsky and Lorry for practical business purposes and knew that federal partnership income tax returns were prepared in the partnership name (T–184, 185).

66. Wilfred Lorry held himself out as a partner of the law firm of Freedman, Borowsky and Lorry before the Committee of Censors of the Philadelphia Bar Association, and represented to that association that the firm included other partners (T–190).

67. Wilfred Lorry held himself out to be a partner of the law firm of Freedman, Borowsky and Lorry to the courts in which he practiced (T–190).

68. The firm of Freedman, Borowsky and Lorry held itself out to the general public and legal profession as a partnership because it was felt that this would be a good business practice and would aid in procuring business (T–177, 178).

69. Petitioner represented the law firms of Freedman, Landy and Lorry and, its successor firm, Freedman, Borowsky and Lorry to the public as a partnership and Wilfred Lorry never did anything to dissuade anyone from that conclusion because it was believed to be a good business practice to make and perpetuate this representation (T–203).

70. During his twenty-two years with petitioner, Lorry never looked at the financial records nor had access to them (T–171).

71. To Lorry's knowledge, no lawyer other than petitioner had access to the financial records of Freedman, Borowsky and Lorry (T–171).

72. During his twenty-two year association with petitioner, Lorry never saw the partnership tax returns filed for either Freedman, Borowsky and Lorry or Freedman, Landy and Lorry (T–173).

73. Petitioner refers to the junior profit-sharing members of his firm as "junior partners" (T–106).

74. The law firm of Freedman, Borowsky and Lorry files federal partnership tax returns (T–8).

75. On the Federal Partnership Income Tax return of Freedman, Borowsky and Lorry, the employer identified thereon is the law firm of Freedman, Borowsky and Lorry. Likewise, the firm name appears on W–2 forms of the firm's employees (T–114)(G–10a, b, c).

76. As set forth in the firm's Federal Partnership Tax return for the years, 1970, 1971 and 1972, respectively, the total income earned by the firm's 11 partners was approximately $2,202,367.-73, $1,673,834.94 and $1,497,223.50 (I–128, 129)(G–10a, b, c).

77. The firm's Federal Partnership Tax returns reflected first year depreciation divided proportionately among all of the partners of the law firm and not taken solely by petitioner individually in its total amount (T–131, 133).

78. As reflected in the firm's Federal Partnership Tax returns, Freedman, Borowsky and Lorry deducts various expenses, including automobile leasing for the members of the firm and the firm investigators. The insurance coverage for these leased automobiles is in the law firm's name and paid by the firm (T–139).

79. The law firm of Freedman, Borowsky and Lorry has claimed as a deduction promotional expenses in the amount of $210,000.00 in its 1972 tax re-

turn which sum was expended by various members of the firm (T–139)(G–10c).

80. The firm, as reflected in its 1972 tax return, has deducted approximately $71,000.00 in convention and meeting expenses for various members of the firm (T–140)(G–10c).

81. The law firm of Freedman, Borowsky and Lorry has deducted proportionately from its gross income contributions in excess of $54,000.00 made to various charities on behalf of the firm (T–142)(G–10c).

82. The Federal Partnership Tax returns of the law firm of Freedman, Borowsky and Lorry reflect that the firm has paid Philadelphia City tax, Net Profit tax, Mercantile tax, General Business tax, Personal property tax, and Sales and Occupancy tax (T–123)(G–10a, b, c).

83. The Federal Partnership Tax returns of the firm of Freedman, Borowsky and Lorry have set forth the firm's capital account, from beginning of the year as to each one of the firm's partners, showing ordinary income, additional first year depreciation, contributions that were made, withdrawals, distribution, and capital income at the end of the year (T–127)(G–10a, b, c).

84. All so-called profit-sharing members of Freedman, Borowsky and Lorry contributed capital to the law firm of Freedman, Borowsky and Lorry as reflected in their respective capital accounts (T–108, 109)(G–10a, b, c).

85. On June 18, 1975 petitioner was served by an agent of the United States Attorney's Office with a grand jury subpoena to produce certain books and records of the law firm of Freedman, Borowsky and Lorry. At that time, the records subpoenaed were either in the firm's Philadelphia office or in the firm's New York office, and some in the possession of the law firm's accountant, Murray Axelrod (T–54, 55, 56) including all of the accountant's work papers; financial statement file; copies of Federal Income Tax returns of the partner-

ship; City Tax returns of the partnership and individual partners and State Tax returns (G–9).

86. On or about June 27 and 30, 1975, petitioner called the law firm's accountant, Murray Axelrod, and asked him to deliver to the firm of Freedman, Borowsky and Lorry all of the records in his possession (T–56).

87. Pursuant to the direction of petitioner, Murray Axelrod, the accountant for the firm of Freedman, Borowsky and Lorry, delivered on or about July 27, and July 30, 1975, to petitioner the various records of the law firm of Freedman, Borowsky and Lorry as set forth in G–9 (T–78, 79).

88. Petitioner has submitted an affidavit in which he contends that he may have been the subject of illegal surveillance by the United States. In support of this allegation, he submits that "the existence of unusual noises or occurrences on the telephone system together with the positive responses obtained . . . in his initial scan of the offices, led [him] to believe that his office may have been subjected to illegal electronic surveillance."

89. The Government has submitted the affidavit of Assistant United States Attorney Frank C. Razzano in which he states that to his knowledge there has been no electronic surveillance of the conversations of petitioner or any electronic surveillance of conversations occurring on premises owned, leased or licensed by him whether or not he was present or participated in those conversations, by the United States Attorney's Office or any agency in the investigation.

90. The United States has also submitted a letter from the United States Department of Justice to the effect that an inquiry has been made with the appropriate federal government agencies in order to determine if there has been any electronic surveillance occurring on premises owned, leased or licensed by petitioner whether or not he was present or participated in those conversations.

Based upon the results of such inquiry, the U.S. Department of Justice has represented that there has been no electronic surveillance of any conversation of petitioner or any electronic surveillance of any premises owned, leased or licensed by him.

91. Petitioner has failed to offer any evidence indicating that the affidavit of Assistant United States Attorney Frank C. Razzano and the letter from the U.S. Department of Justice were false or defective.

92. Petitioner has contended that the grand jury subpoena requiring the production of the firm's financial books and records for the relevant period under investigation is overly broad, burdensome and unreasonable.

93. Petitioner has failed to establish these allegations and the United States has demonstrated the relevancy, necessity and reasonableness of the documents subpoenaed in the affidavit of Assistant United States Attorney Frank C. Razzano dated July 10, 1975.

## CONCLUSIONS OF LAW

The principal question presented for decision is whether the nature and character of the documents sought by the grand jury is such that petitioner, Abraham E. Freedman, may assert the fifth amendment privilege against self-incrimination with respect to their production.

■ In order to place the facts of this case in their proper perspective it is necessary to consider the fifth amendment privilege in the context of some basic postulates. It is of course axiomatic in our system of justice that a witness may not be compelled to give testimony which would tend to incriminate him. This constitutionally inviolable privilege, however, is a purely personal one which precludes the government from eliciting testimony from the individual himself. In other words, the privilege inheres to the person invoking it and may not be claimed by one for the benefit of another. As Mr. Justice

Holmes described it, "A party is privileged from producing the evidence but not from its production." *Johnson v. United States,* 228 U.S. 457, 458, 33 S. Ct. 572, 57 L.Ed. 919 (1913).

As early as 1886, the United States Supreme Court held that the fifth amendment proscribes the compulsory production of incriminating personal papers and effects in addition to oral testimony. *See Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886). As the Court stated in the important case of *Bellis v. United States,* 417 U.S. 85, 87–88, 94 S.Ct. 2179, 2182, 40 L.Ed. 2d 678 (1974):

The privilege applies to the business records of the sole proprietor or sole practitioner as well as to personal documents containing more intimate information about the individual's private life. [citations omitted]

And in *United States v. White,* discussed at length in *Bellis,* the Supreme Court described the principle thusly:

The constitutional privilege against self-incrimination is essentially a personal one, applying only to natural individuals . . . It is designed to prevent the use of legal process to force . . . him to produce and authenticate any personal documents or effects that might incriminate him.

322 U.S. 694, 698, 64 S.Ct. 1248, 1251, 88 L.Ed. 1542 (1943).

■ Although the fifth amendment does prevent the compulsory production of an individual's books or records, it will not shield that individual from producing potentially incriminating records which he holds in a representative capacity for a collective entity. *See Wilson v. United States,* 221 U.S. 361, 31 S. Ct. 538, 55 L.Ed. 771 (1911) (officer of corporation could not claim privilege against self-incrimination where grand jury subpoena was directed to corporation itself); *Dreier v. United States,* 221 U.S. 394, 31 S.Ct. 550, 55 L.Ed. 784 (1911) (officer of corporation could not claim privilege against self-incrimina-

tion where subpoena seeking corporate books and records was directed to the individual corporate officer); *Wheeler v. United States,* 226 U.S. 478, 33 S.Ct. 158, 57 L.Ed. 309 (1913) (fifth amendment privilege could not be claimed with respect to corporate records even though the corporation had previously been dissolved); *see also Grant v. United States,* 227 U.S. 74, 33 S.Ct. 190, 57 L.Ed. 423 (1913).

The aforementioned cases relied, at least in part, upon the fact that the documents sought were those of corporations—artifical entities to which limited powers were granted by the State and which were subject to the retained right of the State to investigate corporate activities. *See, e. g., Wilson v. United States, supra* 221 U.S. at 382–85, 31 S.Ct. 538. However, in *United States v. White, supra,* the Court clearly enunciated that the prior decisions were by no means limited to records of corporations alone. In that case, the Court held that an officer of a labor union, an unincorporated association, could not claim a privilege against self-incrimination and was required to comply with a grand jury subpoena directed at the union's records. An individual, therefore, could not assert a fifth amendment privilege where he held the records of an organization in a representative capacity. 322 U.S. at 699–700, 64 S.Ct. at 1248. Justice Murphy reasoned that

> individuals, when acting as representatives of a collective group, cannot be said to be exercising their personal rights and duties nor to be entitled to their purely personal privileges. Rather they assume the rights, duties and privileges of the artificial entity or association of which they are agents or officers and they are bound by its obligations.

322 U.S. at 699, 64 S.Ct. at 1251.

The Court, in subsequent decisions, has upheld the production of various organizational records over the fifth amendment claims of individuals. *See, e. g., McPhaul v. United States,* 364 U.S. 372,

380, 81 S.Ct. 138, 5 L.Ed.2d 136 (1960) (Civil Rights Congress); *Rogers v. United States,* 340 U.S. 367, 371–72, 71 S.Ct. 438, 95 L.Ed. 344 (1951) (Communist Party of Denver); *United States v. Fleischman,* 339 U.S. 349, 357–58, 70 S.Ct. 739, 94 L.Ed. 906 (1950) (Joint Anti-Fascist Refugee Committee). *See also Curcio v. United States,* 354 U.S. 118, 77 S.Ct. 1145, 1 L.Ed.2d 1225 (1957) (local labor union).

In *Bellis v. United States, supra,* the Supreme Court ruled that a partner in a small law firm could not interpose the fifth amendment privilege to vindicate his refusal to comply with a subpoena requiring the production of partnership books and records. Notwithstanding the limited size of the firm in *Bellis,* the Court was satisfied that it nevertheless had an institutional identity independent of its constituent partners. Since the attorney had possession of the documents in "what can be fairly said to be a representative capacity", the Court held that his personal privilege was inapplicable.

Petitioner herein vigorously argues that, in contrast to *Bellis,* the law firm of Freedman, Borowsky and Lorry, despite its size, is a sole proprietorship the books and records of which are the private and personal property of petitioner. He asserts that the documents are not in fact organizational and are not held by him in a representative capacity. This Court cannot agree.

 While the government suggests that the Court characterize Freedman, Borowsky and Lorry as either a partnership or an unincorporated association, it is unnecessary to do so. *See Bellis, supra,* 417 U.S. at 101, 94 S.Ct. 2179. Whatever the precise label which may be ascribed to the firm, it is clearly not the sole proprietorship which petitioner would have this Court believe. Upon careful consideration of all the facts and circumstances disclosed by the record, this Court concludes that the firm of Freedman, Borowsky and Lorry is an in-

dependent institutional entity separate and apart from its individual members.

Although the Court in *Bellis* found that a partnership did exist, the decision rested upon the fact that the firm was indeed a distinct institutional entity. Stated differently, characterization of the firm as a partnership was not the ultimately determinative factor.

In determining that the firm in *Bellis* possessed an identity separate and apart from its individual members, the Court examined a number of factors. Of importance to the Court were the following:

> The firm maintained a bank account in the partnership name, had stationery using the firm name on its letterhead, and, in general, held itself out to third parties as an entity with an independent institutional identity. It employed six persons in addition to its partners, including two other attorneys who practiced law on behalf of the firm, rather than as individuals on their own behalf. It filed separate partnership returns for federal tax purposes, as required by § 6031 of the Internal Revenue Code [26 U.S.C. § 6031]. State law permitted the firm to be sued, [Pa.Rule Civ.Proc. 2128, and to hold title to property, Pa.Stat. Ann., [Tit. 59], § 13(3), in the partnership name, and generally regarded the partnership as a distinct entity for numerous other purposes.

417 U.S. at 96–97, 94 S.Ct. at 2187. The government correctly points out that each of those indicia is present in the case at bar.

Freedman, Borowsky and Lorry had at least three bank accounts in the firm name. In addition, both petitioner and Wilfred Lorry have admitted representing themselves as partners in the firm of Freedman, Borowsky and Lorry on numerous occasions. These representations have been made over a period of many years to the courts, bar associations, clients, and to the public at large. The firm employs approximately fifty individuals other than attorneys, in both Philadelphia and New York City. The firm consists of twelve profit-sharing attorneys who are held out as partners in the firm, and nine salaried attorneys. The firm files separate partnership returns for federal tax purposes and may have held title to real property in the firm name. Furthermore, the lease to its office space was negotiated in the firm name by petitioner and two of his "partners".

There are several other factors which lend support to this Court's conclusion. For example, the hearing disclosed the following:

(a) the firm represents itself in *Martindale-Hubble* as consisting of twelve members and nine associates;

(b) the firm has purchased in the name of Freedman, Borowsky and Lorry, bonds of the State of Pennsylvania and the State of Israel;

(c) the firm makes payments for Blue Cross or Blue Shield medical insurance policies;

(d) the firm pays Workmen's Compensation, Pennsylvania Unemployment taxes and Sales taxes in the firm name;

(e) depreciation on firm assets is divided proportionally among all of the profit-sharing members of the firm;

(f) charitable contributions are made in the firm name;

(g) business expenses are deducted from the gross income of the firm;

(h) all of the profit-sharing attorneys have contributed capital to the firm as reflected in their respective capital accounts.

In light of the foregoing, there can be no doubt that the firm of Freedman, Borowsky and Lorry possesses an identity separate and distinct from that of the petitioner.

The Court's analysis, however, must go one step further in order to determine whether the records sought by the grand jury are those of the organization or those of the petitioner, and thus exempt from compulsory production.

Despite the conclusions embodied in petitioner's testimony with respect to his dominion and control over the books and records of the firm, it is the finding of this Court that such records are the property of the collective entity and are held by petitioner in a representative capacity.

The Court is mindful of the differences between the facts in this case and those in both *Bellis* and *White*. In *Bellis*, the Court recognized that the books and records were partnership property subject to the rights of other partners under Pennsylvania law. The Court in *White* acknowledged the right of union members to inspect organizational books and records. Although it appears that no such absolute right of inspection exists in the firm of Freedman, Borowsky and Lorry, that can have little consequence in view of the nature, origins and uses of the organizational records under consideration here.

Indeed, it is the attorneys in the firm of Freedman, Borowsky and Lorry, rather than petitioner alone, whose activities are primarily responsible for creating the books and records in question. As in *Bellis*:

> These reflect the receipts and disbursements of the entire firm, including income generated by and salaries paid to employees of the firm, and the financial transactions of the other partners.

417 U.S. at 98, 94 S.Ct. at 2188. It is inconceivable to this Court that the records of a firm which generates in excess of three million dollars annually represent the purely personal interests of petitioner. Quite the contrary, the records sought here are merely the "impassive and impersonal records of business events transacted between the firm and those with whom it dealt." *United States v. Quick,* 336 F.Supp. 744 (E.D. N.Y.1972). Despite the manner in which petitioner controls the firm's books and records, it is this Court's opinion that he holds them as a representative for the entity known as Freedman, Borowsky and Lorry.

It is therefore the holding of this Court that the law firm of Freedman, Borowsky and Lorry is an institutional entity separate and apart from petitioner and the other members of the firm. Further, the documents sought by the grand jury are not the personal or private effects of petitioner but are held by him in a representative capacity. Accordingly, there can be no rational basis for upholding the claim of fifth amendment protection against compulsory self-incrimination. The sentiments of Mr. Justice Murphy are particularly appropriate here:

> The scope and nature of the economic activities of incorporated and unincorporated organizations and their representatives demand that the constitutional power of the federal and state governments to regulate those activities be correspondingly effective. The greater portion of evidence of wrongdoing by an organization or its representatives is usually to be found in the official records and documents of that organization. Were the cloak of the privilege to be thrown around these impersonal records and documents, effective enforcement of many federal and state laws would be impossible. The framers of the constitutional guarantee against compulsory self-disclosure, who were interested primarily in protecting individual civil liberties, cannot be said to have intended the privilege to be available to protect economic or other interests of such organizations so as to nullify appropriate governmental regulations.

*United States v. White, supra,* 322 U.S. at 700, 64 S.Ct. at 1252. [citations omitted].

■ The only other issue that must be resolved at this time is whether petitioner was the subject of illegal electronic surveillance. This Court is satisfied on the basis of the representations of the United States and the lack of proof

on the part of petitioner that there was no electronic surveillance in this case on the part of any government agency. *See United States v. D'Andrea,* 495 F.2d 1170 (3d Cir.), *cert. denied,* 419 U.S. 855, 95 S.Ct. 101, 42 L.Ed.2d 88 (1974); *In re Tierney,* 465 F.2d 806 (5th Cir. 1972).

In accordance with this Opinion, the petitioner will produce before the grand jury sitting in Newark, New Jersey the documents and records listed in the subpoena. Petitioner shall comply with this directive on August 12, 1975.

The government shall submit an appropriate order forthwith.