**In the Matter of GRAND JURY IMPANELED JANUARY 21, 1975.**

**Appeal of Abraham E. FREEDMAN.**

**No. 75–2312.**

United States Court of Appeals, Third Circuit.

Argued Dec. 8, 1975.

Decided Jan. 8, 1976.

Certiorari Denied May 24, 1976. See 96 S.Ct. 2203.

---

Howard Gittis, Alan J. Davis, Mark A. Aronchick, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for appellant; Richard A. Levin, Amster & Levin, Newark, N. J., of counsel.

Jonathan L. Goldstein, U. S. Atty., John J. Barry, Chief of Appeals, Frank C. Razzano, Asst. U. S. Atty., Newark, N. J., for appellee.

Before SEITZ, Chief Judge, and GIBBONS and ROSENN, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

This is an appeal from an order of the district court adjudging appellant Abraham Freedman in civil contempt for his refusal to obey a court order enforcing a grand jury subpoena duces tecum.[1] The subpoena, dated June 16, 1975, requested the production of 26 categories of documents dealing with various aspects of the financial affairs of the Philadelphia law firm of Freedman, Borowsky & Lorry for the previous 10 years. It was addressed to "Any Responsible Officer Freedman, Borowsky & Lorry," was served on Freedman on June 18, 1975, and was returnable before the Grand Jury at Newark, New Jersey on June 23, 1975. By agreement with the United States Attorney the return date was extended to permit disposition of a motion to quash. On July 11, 1975 Freedman moved to quash. The motion asserted

that Freedman "owns, possesses and controls the books, papers and records described in said subpoena" and resisted compliance on grounds (1) that there was no showing that the records were relevant to any investigation over which the Newark Grand Jury had jurisdiction, and (2) that the subpoena was unconstitutionally overbroad both in scope and in time. In response to this motion the government filed an affidavit which disclosed that the grand jury was investigating alleged violations of federal criminal law by the National Maritime Union, its officers and employees, including potential violations of the Internal Revenue Code, 26 U.S.C. § 7201 et seq., the Interstate Travel Act, 18 U.S.C. § 1952 and the Federal Conspiracy Statute, 18 U.S.C. § 371. The affidavit states in part:

> In essence, the grand jury is investigating allegations that officers and employees who are or were New Jersey residents made and received illegal payments, which payments may not have been reported as income by the recipients and which may have been illegally deducted as business expenses on the income tax returns of the payors.
>
> . . . . .
>
> [I]n the context of this investigation there were allegations of criminal wrongdoing on the part of members of the firm of Freedman, Borowsky and Lorry.
>
> . . . . .
>
> The items sought in the subpoena were relevant and necessary to the Grand Jury investigation and are not sought primarily for another purpose.[2]

At a hearing on the motion to quash on July 14, 1975, Freedman contended that the government's affidavit was an insufficient compliance with *In re Grand Jury Proceedings*, 486 F.2d 85 (3d Cir. 1973) (*Schofield I*) and *In re Grand Jury*

---

1. The district court opinion is reported at 399 F.Supp. 668 (D.N.J.1975).

2. Affidavit of Frank C. Razzano, Assistant United States Attorney for the District of New Jersey, 11a–13a.

*Proceedings,* 507 F.2d 963 (3d Cir. 1975) (*Schofield II*). The district court ruled that the government had satisfied the *Schofield* criteria, denied the motion to quash, and directed Freedman to "produce at 10 A.M. on Tuesday, July 15, 1975, to the Grand Jury, any and all books, records, documents and correspondence set forth in the Subpoena duly served upon the movant." The order did not direct Freedman to testify, but only to produce specific records.

On July 15, 1975 Freedman appeared before the grand jury but refused to produce the subpoenaed records for the reasons previously asserted, and because the production of such materials would violate his privilege against self-incrimination, and because he suspected that he had been the subject of unlawful electronic surveillance by the United States. On July 16, 1975 the district court entered an order scheduling a hearing on July 23, 1975 to determine (a) whether the law firm of Freedman, Borowsky & Lorry is a sole proprietorship of Freedman, as he contended, and (b) whether the grand jury subpoena was issued as a result of any unlawful electronic surveillance.[3]

The hearing actually commenced on July 24, 1975. In response to the suggestion that the grand jury subpoena might have been the result of unlawful electronic surveillance, the government produced the affidavit of Frank C. Razzano, an Assistant United States Attorney, and a letter from an official of the Department of Justice.[4] The hearing was addressed primarily to Freedman's contention that he had the sole proprietary interest in the subpoenaed records, and that they were covered by his privilege against self incrimination. The district court concluded that the subpoenaed records belonged to the law firm of Freedman, Borowsky & Lorry, an institutional entity separate and apart from Freedman, and thus that the records were not held by Freedman as personal and private effects but in a representative capacity for the entity. The court also concluded that the government's denial of unlawful electronic surveillance satisfied 18 U.S.C. § 3504(a)(1) (Supp. 1973). It denied the motion to quash and ordered Freedman to produce the records to the grand jury on August 12, 1975. As with the July 14, 1975 order, the court directed production only, not testimony. 399 F.Supp. at 679.

When Freedman did not comply the court, on the government's petition, directed that he show cause on September 8, 1975 why he should not be adjudged in criminal and/or civil contempt. In answer to the petition Freedman asserted that he should not be adjudged in contempt because:

"(a) Mr. Freedman is entitled to assert his privilege against self-incrimination with respect to the records;

(b) the government has failed sufficiently and adequately to attest to relevancy, jurisdiction and proper purpose;

(c) the subpoena is overbroad and amounts to an unreasonable search and seizure; and

(d) the government insufficiently denied Mr. Freedman's claim of electronic surveillance . . . ."

On the adjourned return date of the order to show cause the government pressed only the application for civil contempt. After hearing testimony and argument the district court concluded that Freedman was in civil contempt and entered an order remanding him to the custody of the Attorney General until he complied with the order for production

---

**3.** The order also directed Freedman to produce the records for examination in camera to assist the court in ruling on the contention that the law firm was a sole proprietorship. When Freedman refused to comply with that part of the order he was adjudged to be in civil contempt. On July 22, 1975 a panel of this court summarily reversed both the finding of civil

contempt and the order for in camera production of the records, without prejudice to the right of the United States to reinstate contempt proceedings following the evidentiary hearings scheduled for July 23, 1975.

**4.** The electronic surveillance issue is discussed hereinafter in Part D.

of the records. It also assessed a coercive fine of $1500 per day until such time as he complied. From that order Freedman appeals, asserting the four objections to the production order set forth in his answer to the government's contempt petition, and the additional contention that in a civil contempt proceeding the court may not impose a coercive monetary fine.[5] We vacate the order of the district court and remand.

## A. FREEDMAN'S PERSONAL INTEREST IN THE LAW FIRM'S RECORDS

Freedman, relying on *Bellis v. United States*, 417 U.S. 85, 92–93, 94 S.Ct. 2179, 40 L.Ed.2d 678 (1974), urges that before books, records and papers can be said to fall outside the scope of the fifth amendment privilege against self incrimination the court must find (1) that the records reflect the organized institutional activity of an entity independent of individual members, and (2) that the records subpoenaed are held by the possessor in a representative capacity for that entity. He contends that although the law firm of Freedman, Borowsky & Lorry has held itself out to the public, the courts and the legal profession as a partnership, has filed both federal and local partnership tax returns, has leased office space in the partnership name and purchased office equipment, real estate, securities and insurance in the name of the firm, all the objective indicia of institutional status should in this instance be disregarded because internally Freedman has at all times since 1932 been the sole proprietor of the professional practice in question, under an arrangement whereby his word with respect to every decision is final. He contends that as a law firm Freedman, Borowsky & Lorry has no institutional existence apart from him, and that every book, paper, chair, desk and file is his personal property.

■ We believe the district court correctly concluded that Freedman's fifth amendment privilege did not embrace the subpoenaed records, and affirm that judgment. On the basis of the facts adduced and found by the district court,[6] we are satisfied that it correctly held that Freedman, Borowsky & Lorry possesses an identity separate and distinct from that of the petitioner. It is true that Freedman, and several members of the firm, testified that despite all objective external manifestations, Freedman, Borowsky & Lorry is not an institution having separate existence from Freedman, and is his alter ego only. But their testimony to that effect reflects only their legal conclusion. The objective facts found by the district court fully support the contrary legal conclusion.

Freedman contends that the district court's finding that he alone among the lawyers had access to the books and ledgers of Freedman, Borowsky & Lorry establishes his privilege to the records under the second prong of the *Bellis* test. This argument distorts the holding of that case.

■ We do not understand *Bellis* to hold that once an institution is determined to be an entity independent of its members, the records of that entity may nonetheless be protected by the purely personal privilege against self incrimination if the members of the organization agree that access to those records will not be shared. Access is one indicium bearing upon the question of institutional separateness. In this case, the facts found by the district court, including facts pertaining to Freedman's exclusive access to certain financial books and records, fully support the conclusion that Freedman, Borowsky & Lorry has an institutional identity apart from Freedman. That being so, the fact that Freedman preserves his exclusive access to certain records is inconsequential for fifth amendment purposes. To hold that the members of an institution could resurrect the fifth amendment privilege with respect to records, that they individually

---

**5.** The order was stayed by the district court pending an appeal to this court.

**6.** The district court's findings of fact are set forth in its opinion. 399 F.Supp. at 669–75.

forfeited by identifying themselves with that institution, would seriously erode the established principle that the privilege against self-incrimination is purely personal. *See Hale v. Henkel,* 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906). This we decline to do. We therefore hold that Freedman was not legally entitled to assert his fifth amendment privilege in defense to production of the subpoenaed records.

### B. THE GOVERNMENT'S SHOWING OF RELEVANCY, JURISDICTION, AND PROPER PURPOSE

In *Schofield I* we held that the district courts in this circuit should not casually rubber stamp petitions for the enforcement of grand jury subpoenas, but should require that the government show (1) the grand jury's jurisdiction, (2) relevancy of the subpoenaed materials to an investigation within that jurisdiction, and (3) the absence of an unrelated purpose.

■ Freedman's objection to the grand jury investigation in Newark is territorial. The law firm has offices in Philadelphia and New York. The National Maritime Union has its headquarters in New York. Although some members of the law firm and some officers of the union reside in New Jersey, he urges that the investigation will necessarily center around activities in New York and in Philadelphia. We have said "Historically, Grand Juries have been constituted for the purpose of ascertaining whether or not crimes have been committed *in their district.*" *United States v. Neff,* 212 F.2d 297, 302 (3d Cir. 1954) (emphasis supplied). *See also Brown v. United States,* 245 F.2d 549 (8th Cir. 1957); *United States v. Lazaros,* 480 F.2d 174, 178 n. 6 (6th Cir. 1973); Comment, United States v. Dionisio: The Grand Jury and the Fourth Amendment,

73 Colum.L.Rev. 1145, 1147–48 (1973). But since the grand jury is investigating allegedly illegal payments which may not have been reported as income by residents of the district of New Jersey, or which may have been illegally deducted in computing the income tax paid by residents of New Jersey, the contention that the subpoena was issued by a grand jury which lacked jurisdiction is fanciful.[7]

■ Turning to relevancy and purpose, we note that the government's affidavit discloses that the subpoena is for the purpose of a proper grand jury investigation, and not primarily for another purpose. It cannot be gainsaid that much of the material subpoenaed would be relevant to an inquiry into illegal payments allegedly made to officers of the National Maritime Union. Here, however, we come to the question of overbreadth. If the subpoena seeks large quantities of documents, some of which appear to be relevant to the investigation which has been identified by the government as the jurisdictional predicate for grand jury action, the court cannot without further inquiry accept at face value the conclusory allegation that the subpoena is not for a purpose unrelated to that inquiry.

■ The subpoena in this case commands production of 26 categories of documents for a ten year time span. Although only the relationship between Freedman, Borowsky & Lorry and the National Maritime Union has been identified as the focus of the investigation, the subpoena seeks financial records relating to non-maritime clients as well.[8] The overbreadth objection was made at the outset. The district court ruled:

"I'm sure the Department of Justice has no interest in Jones to McLaughlin, any conveyance for real estate, for example, or as to a bill paid, but it

---

7. We reject as incompatible with our holding in *Schofield I* the government's argument that the person to whom a grand jury subpoena is directed lacks standing to challenge the jurisdiction of the issuing body.

8. A good example of the breadth of the subpoena is category 14, "Contracts and copies of contracts including all retainer agreements."

should be produced, in this Court's opinion, and it will be returned forthwith, I am sure it will." (Tr. July 14 hearing, 36a–37a).

With deference, we conclude that this ruling was an insufficient compliance with the requirements of *Schofield I.* Freedman was entitled to *some* explanation why records of the firm's dealings with other clients, or with suppliers of office supplies, was relevant to the grand jury's investigation of graft in the NMU. Without *some* explanation, the district court simply cannot discharge its obligation to guard against misuse of the court's process. It is not enough to require the indiscriminate production of records and then permit the return of irrelevant documents after the government has rummaged through them. The overbreadth problem is particularly acute with respect to institutions such as law offices, with which third parties often deal with significant expectations of privacy.

## C. FREEDMAN'S OVERBREADTH CONTENTION

 Freedman would have us not only rule on the sufficiency of the government's showing of relevance, but also hold that as a matter of law the subpoena is so overbroad as to violate the fourth amendment and thus can be ignored. This we cannot do at the appellate level on this record. It is conceivable that the government will be able to satisfy the district court that most, if not all, of the subpoenaed materials are relevant to the grand jury's investigation. And while we have held that the district court required too little disclosure of relevancy, at the same time we disapprove the remedy to which Freedman resorted: the withholding of all records, even those clearly relevant. There are materials listed in the schedule attached to the subpoena which under the narrowest definition of relevancy should have been produced. It is arguable, of course, that when the government draws an overbroad subpoena the court

should merely decline enforcement under 28 U.S.C. § 1826(a). Such a wooden construction of the civil enforcement remedy would result in the multiplication of civil enforcement proceedings. Our ruling in *Schofield I* was not intended as an opportunity for gamesmanship, but as a device for the protection of substantial interests of privacy. Nor should it make any difference that the proceedings were commenced by Freedman's motion to quash rather than by a government motion to enforce. The proper remedy for overbreadth is an order directing partial compliance. The district court should then rule on the disputed items. At a minimum the records relating to the firm's relationship with the National Maritime Union should have been ordered produced immediately.

## D. THE GOVERNMENT'S DENIAL OF ELECTRONIC SURVEILLANCE.

 When a grand jury witness raises the issue of possible electronic surveillance as the source of a subpoena or questions, the government is bound to affirm or deny the occurrence of such surveillance. 18 U.S.C. § 3504(a)(1) (Supp.1973). An insufficient denial is just cause for refusing to answer questions or produce subpoenaed records. *Gelbard v. United States,* 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972). Freedman raised the issue. In response the government filed the affidavit of Frank C. Razzano, an Assistant United States Attorney conducting an investigation of alleged violations of the federal criminal law by the National Maritime Union. He swore that he had received no information that would indicate any electronic surveillance of Freedman or of any premises owned, leased or licensed by him, that he inquired of the United States Attorney for the District of New Jersey whether there was any electronic surveillance and had been informed that none was authorized or engaged in, and that on July 16, 1975 he caused a similar inquiry to be made of the Department of Justice. The government also produced

a response to that inquiry in a letter quoted in the margin.[9] The district court concluded:

> This court is satisfied on the basis of the representations of the United States and the lack of proof on the part of petitioner that there was no electronic surveillance in this case on the part of any government agency.[10]

In *United States v. D'Andrea*, 495 F.2d 1170 (3d Cir.) (per curiam), *cert. denied*, 419 U.S. 855, 95 S.Ct. 101, 42 L.Ed.2d 88 (1974), this court held that a denial based on third-party information is sufficient compliance with 18 U.S.C. § 3504(a)(1) where the complaining party has come forward with nothing more than a bald allegation of illegality. *See also In re Horn*, 458 F.2d 468 (3d Cir. 1972) (per curiam). Freedman argues that a more formal denial is necessary in this case because he has substantiated his charge with more than conclusory allegations. Specifically, Freedman stated in an affidavit that "[f]or some time prior to June 18, 1975" he was aware of "[s]trange noises or 'clicks'" during phone conversations, and that "on occasion, calls were inexplicably disconnected." Freedman's affidavit further recited that he engaged a private investigator to scan the law firm's offices for the presence of electronic surveillance. During this scan the investigator detected a positive response, "indicating that electronic surveillance *might* be present" (emphasis supplied). Subsequent checks of the firm's telephone lines by the telephone company

and another private investigator did not uncover any surveillance. We do not believe that these minimal factual allegations require the government to respond to Freedman's inquiry with any more formal denial than was entered here. We find no error in the court's ruling that the government's denial was adequate. We reject Freedman's contention that we should reconsider our *D'Andrea* holding and place a heavier burden on the government than the case imposed.

### E. THE COERCIVE FINE

After adjudging Freedman to be in civil contempt, the court ordered him jailed until he complied and also ordered him to pay $1500 for each day he continued to be in contempt of its order. The $1500 per day fine is intended as a coercive sanction to force compliance with the order. Freedman urges that there is no statutory authority for such a sanction. Authority for civil coercion for disobedience of court orders in connection with grand jury proceedings is found in Title III, § 301(a) of the Omnibus Crime Control Act of 1970, 28 U.S.C. § 1826(a). The statute in terms refers only to coercion by confinement, but its legislative history indicates that it was intended to "codify present civil contempt practice."[11] We have found no case where a coercive fine was imposed on a contumacious witness under 28 U.S.C. § 1826(a). In *United States v. Liddy*, 166 U.S.App.D.C. 289, 510 F.2d 669, 676 (1974) (en banc), *cert. denied*, 420 U.S. 980, 95 S.Ct. 1408, 43 L.Ed.2d 661 (1975),

---

**9.** The government's response, addressed to Jonathan Goldstein, United States Attorney for the District of New Jersey and signed by William Lynch, Chief of the Organized Crime and Racketeering Section of the Criminal Division of the Justice Department, read as follows (426a):

> "This is with regard to your request that we ascertain whether the following individual was monitored by electronic surveillance. A review of the Department of Justice files discloses no information indicating that conversations of Abraham E. Freedman were at any time overheard by electronic surveillance or that premises known to be owned, leased or licensed by him were cov-

ered by electronic surveillance by the Federal Bureau of Investigation.
> Also, the above-named individual was never subjected to electronic surveillance by the Internal Revenue Service, the United States Postal Service, the United States Secret Service, the Bureau of Alcohol, Tobacco, and Firearms, the Drug Enforcement Administration, or the Bureau of Customs."

**10.** 399 F.Supp. at 678–79.

**11.** H.R.Rep. No. 91–1549, 91st Cong., 2d Sess. (1970), 1970 U.S Code Cong. & Admin.News p. 4008, quoted in *Schofield I, supra*, 486 F.2d at 88.

the District of Columbia Circuit suggested in dicta that the court might lack power under the statute to utilize such a remedy. But monetary penalties for civil contempt have been justified in other contexts as valid attempts to coerce compliance with court orders. *See, e. g., United States v. United Mine Workers of America*, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947); *International Business Machines Corp. v. United States*, 493 F.2d 112 (2d Cir. 1973), *cert. denied*, 416 U.S. 976, 94 S.Ct. 2378, 40 L.Ed.2d 756 (1974). In at least one case prior to the enactment of § 1826 a federal court imposed a coercive fine on a witness who failed to appear before a grand jury. *United States v. Germann*, 370 F.2d 1019 (2d Cir.), *vacated per curiam on other grounds*, 389 U.S. 329, 88 S.Ct. 503, 19 L.Ed.2d 559 (1967). We do not detect in the enactment of § 1826 an intention on the part of Congress to remove from the arsenal of the federal courts an enforcement weapon they were long thought to possess.

This conclusion is reinforced by the manifest necessity for some civil sanction other than imprisonment of a civil contemnor. By the terms of § 1826(a)(2), a person who refuses to purge himself of his contempt can be imprisoned only for the life of the grand jury whose order he has ignored. As the term of a grand jury draws to a close, the coercive effect of the jail sanction is obviously attenuated. If the grand jury were denied an effective sanction for disobedience occurring late in its life, its ability to discharge its duties would be seriously impaired. We do not believe that in enacting the Omnibus Crime Control Act—a decidedly hard-line piece of anti-crime legislation—Congress intended to accomplish such a result. We therefore conclude that the district court has power to impose upon a civil contemnor a coercive monetary fine.

It does not necessarily follow, however, that the range of penalties available to a court under § 1826 are cumulative. We have not been cited to any case where a coercive monetary fine was levied in conjunction with imprisonment. These flexible sanctions, in our view, allow the district court to apply the degree of coercion minimally necessary to gain compliance with its orders, but do not vest the court with the power to visit Draconian punishment upon the civil contemnor. We therefore hold that a district court may use these civil sanctions interchangeably or successively, but not simultaneously in the absence of findings supported by the record showing the necessity for such severe action. The court should apply the least coercive sanction (e. g., a monetary penalty) reasonably calculated to win compliance with its orders. If compliance is not forthcoming, the initial penalty may be increased, or a new penalty appropriate under the circumstances may be selected. We do not believe that the simultaneous imposition of monetary and jail sanctions necessarily adds to the in terrorem effect of a properly devised solitary sanction. *Cf.* 18 U.S.C. § 401.

## CONCLUSION

The order of the district court directing compliance with the grand jury subpoena was correct in all respects except for the court's failure to require a more complete showing of the relevancy to the grand jury investigation of some of the materials subpoenaed. Freedman should have complied with the order at least to the extent of furnishing all materials relating to the National Maritime Union's dealings with Freedman, Borowsky & Lorry. Since, however, he had at the outset objected to the subpoena on overbreadth grounds the order of the district court adjudging him in contempt will be vacated and the case remanded to the district court for the purpose of (1) affording Freedman an opportunity promptly to furnish those materials listed in the schedule attached to the subpoena relating to the dealings between the National Maritime Union, its officers and agents, and the firm of Freedman, Borowsky & Lorry, and (2) affording the

government the opportunity to demonstrate that other records listed in the schedule are relevant to the grand jury's investigation.